# EXHIBIT 16

**AMERICAN ARBITRATION ASSOCIATION**

In the Matter of the Arbitration between

    VOLVO CONSTRUCTION EQUIPMENT
    NORTH AMERICA, LLC,

        Claimant,

    v.                              No.  01-22-0002-4846

    PACWEST MACHINERY, LLC,

        Respondent.

ADMINISTRATOR:  Julie Molloy

## ORDER NO. 3

In Order No. 2, the Panel bifurcated the issues of liability and damages,  Pursuant to AAA Rule 34, the Panel additionally set a schedule for briefing motions for summary disposition.   Briefing of cross-motions was completed on March 3, 2023, and extensive argument was heard on March 17, 2023.  This order contains the Panel's decisions on the issues presented for summary disposition.  It is not a final award on the issues addressed herein.

Although the parties did not brief the standards for issuance of summary judgment under Pennsylvania law, we apply the nearly universal formulation that summary judgment is appropriate when there are no genuinely disputed issues of material fact and the movant has shown that it is entitled to judgment as a matter of law.

## I.    Was the Side Letter Terminated by the Integration Provision?

Claimant ("Volvo") seeks a determination that the 2015 Dealer Agreement between Volvo and PacWest Machinery LLC ("PacWest") "superseded and terminated" the Side Letter

dated December 8, 2015, from Volvo to JGC Dealer Co., as PacWest was formerly known. (Volvo Op. Br., p. 7.) PacWest seeks the contrary determination that the Side Letter is valid and enforceable. Based upon the summary judgment record as a whole, the Panel concludes that there is no genuinely disputed issue of fact that the Side Letter is, indeed, valid and enforceable under Pennsylvania law as PacWest contends.[1] Accordingly, the Panel denies Volvo's motion for summary disposition on this issue and grants PacWest's cross-motion.

Pennsylvania law holds that where several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other. *Wilson v. Viking Corp.*, 134 Pa. Super. 153, 3 A.2d 180. *See also Landreth v. First National Bank*, 346 Pa. 551, 31 A. 2d 161. Volvo acknowledges that "[f]rom August 26, 2015 to December 7, 2015, PacWest and Volvo exchanged edited drafts of the side Letter and the 2015 Dealer Agreement." (Volvo Op. Br., p. 3,) In addition to being negotiated at the same time, the parties executed them at the same time. Volvo's Vice President-Dealer Development signed the Letter Agreement on December 8, 2015, and PacWest signed the next day at the closing of its purchase of the selling dealer's assets. PacWest and Volvo each executed the Dealer Agreement a week later on December 17, 2015.

The two agreements refer to each other. Section 3.5 of the Dealer Agreement provides that "[e]xcept as set forth in the side letter dated December 8, 2015" PacWest does not obtain by virtue of the Dealer Agreement any rights to territorial expansion. This statement strongly suggests that Volvo and PacWest understood that the Side Letter was to continue in effect after

---

[1] Under Section 27.1 of the 2015 Dealer Agreement, the parties agreed that "the validity, enforceability, and effectiveness of each provision hereof and the obligations, rights, and remedies of each party shall be governed by and construed in accordance with the law of the state of Pennsylvania . . . . ."

execution of the Dealer Agreement. Moreover, paragraph 7 of the Side Letter provides that its "terms, conditions, duties and obligations" are subject to PacWest's execution of the 2015 Dealer Agreement. This is a clear statement that the parties expected the Side Letter to continue in effect after execution of the Dealer Agreement. The language of the agreements thus shows that the parties intended that the Side Letter would co-exist with the Dealer Agreement.

This conclusion is further strengthened by the fact that when PacWest sought to modify Section 3.5 of the Dealer Agreement to provide territory expansion rights (Ex. 15), Volvo suggested that they should be moved to the Side Letter. (Ex. 16.) The result was that specific terms regarding territorial expansion were drafted into paragraph 3 of the Side Letter. These rights, which clearly contemplate the potential expansion of PacWest's sales territory while operating under the 2015 Dealer Agreement, would be meaningless if we were to apply the integration provision as Volvo now contends. In short, we find that the Side Letter and Dealer Agreement refer to and incorporate each other and thus are two parts of a single contractual undertaking.

Volvo's argument is based entirely on the fact that the Side Letter became effective nine days before the Dealer Agreement became effective. From this it argues that the Side Letter constitutes a "prior agreement" that the Dealer Agreement's integration clause invalidates. This argument ignores, as stated above, that the agreements were negotiated at the same time and each refers to the other. Moreover, Volvo presented no evidence that the parties specifically negotiated that the Side Letter would commence prior to the new Dealer Agreement or that staggered effective dates would serve some mutual purpose or object. To the contrary, Volvo admits that the Dealer Agreement went into effect nine days after the Side Letter only because Volvo's agreement with the selling dealer did not expire until December 16, 2015. Accordingly,

the new Dealer Agreement with PacWest was executed the following day, December 17, 2015. There is nothing in the evidence that suggests that the difference in effective dates signaled that the parties intended that the Side Letter would cease to exist when the Dealer Agreement became effective.

**II.      The Terms and Meaning of Paragraph 3 of the Side Letter.**

In brief, Volvo contends that there was no meeting of the minds as to the terms of the Side Letter and that to the extent the parties reached agreement on terms, Volvo complied with paragraph 3. PacWest asserts that there was agreement on the terms of paragraph 3, Volvo breached those terms, and PacWest is entitled to damages. Volvo responds that because PacWest never entered into definitive agreements with prospective selling dealers, it cannot be liable to PacWest. Additionally, it asserts that Section 18.4 of the 2015 Dealer Agreement bars PacWest's claims to damages.

Paragraph 3 of the Side Letter provides that if PacWest satisfies two conditions, Volvo has two obligations with regard to territory expansion. The conditions are that (i) PacWest accounts for no more than 15% of Volvo's machine sales in North America over three years, and (ii) PacWest "is meeting a majority of the mutually agreed key performance metrics" in its current territory. If those conditions are met, (a) then in the event an existing dealer in western United States or Canada desires to sell, "Volvo CE will make an introduction for the parties and make reasonable efforts to offer [PacWest] a first opportunity to acquire the additional territory"; and (b) if Volvo shall become the owner of such dealership, PacWest shall have a right of first refusal to purchase the same from Volvo. Paragraph 3 concludes that any "new Territory assigned will require a new Dealer Agreement for that Territory, which terms shall be similar to [PacWest's] current Dealer Agreement(s)." (Ex. A.)

**(1)** **Key Performance Metrics.**

Volvo asserts that there was no meeting of the minds because there was no agreement as to the key performance metrics and no definition of them appears in the Side Letter.

Section 6.2 of the 2015 Dealer Agreement states that the "quantity of Volvo Machines ordered and paid for by the Dealer from time-to-time hereunder and the market share of the Volvo Products within the Territory will be *key performance metrics* in Volvo's evaluation of the Dealer's performance." It further states that "[a]dditional *key performance metrics* will also initially include the Dealer's customer service levels, profitability, safety performance, staff training and readiness, and potentially other measurements as may be agreed from time to time." (Emphasis added.) Because the Side Letter and Dealer Agreement are, as found above, two parts of a single contractual arrangement, we have no difficulty in concluding that the phrase "key performance metrics" as used in the Side Letter refers to the "key performance metrics" defined in Section 6.2 of the Dealer Agreement.

**(2)** **The Requirement of an Introduction by Volvo.**

Clause (a) of Paragraph 3 states that Volvo "will make an introduction" to a dealer desiring to sell and shall make "reasonable efforts" to give PacWest a first opportunity to acquire the additional territory. In this case, the dealers who desired to sell notified Volvo that they wished to sell to PacWest. Volvo contends that because it did not make the introduction mentioned in clause (a), then it had no obligation to make "reasonable efforts" to give PacWest a first opportunity to acquire the territory.

This position is not well-founded. First, nothing in paragraph 3 makes the introduction a condition precedent to the duty to use reasonable efforts. Absent such language, we cannot conclude that the absence of an introduction by Volvo excuses Volvo from exercising reasonable efforts to provide PacWest with a first opportunity to acquire the territory. Second, once Volvo

is advised that a particular dealer is interested in selling to PacWest, the purpose of an introduction has been satisfied: PacWest and the selling dealer are in a position to negotiate a deal, and in fact may have already done so, and Volvo is in position to use reasonable efforts as required by paragraph 3. There is nothing in either the Side Letter or the evidence before us that suggests that the identity of the party initiating the communication has any importance. Indeed, in a letter dated May 20, 2022, from Stephen Roy to Andrew Wold, which recounted the history of PacWest's request for approval of expansion in Montana, Mr. Roy noted that "PacWest and Tri-State engaged in discussions about such potential transaction without the assistance of Volvo CE, which is the usual initial process for dealer transfers and acquisitions -subject to our prior approval." (Exs. 156, p. 1.)

That Volvo had no need to make an introduction in the present case cannot excuse performance of the independent duty that Volvo use reasonable efforts to offer PacWest a first opportunity to acquire the additional territory.

**(3)     What are "reasonable efforts"?**

Volvo characterizes PacWest's position on reasonable efforts as "pre-approval" of a territory expansion. PacWest denies this but contends that Volvo's approval is merely ministerial. Volvo, on the other hand, contends that reasonable efforts empower it to use its standard review process to evaluate a territory expansion and refuse those expansions that do not meet its requirements. PacWest responds that no standards are articulated in the Dealer Agreement or published by Volvo and that review under undisclosed standards would enable Volvo to arbitrarily deny PacWest the expansion rights contained in the Side Letter.

We think the answer lies between the parties' positions. Although there is no evidence the parties specifically negotiated the words "reasonable efforts," the use of that phrase cannot be read to mean that PacWest is automatically entitled to territory expansion simply upon

presentation to Volvo of a signed transaction with an existing dealer. Instead the obligation of reasonable efforts was limited to offering PacWest "a first opportunity to acquire additional territory." If automatic approval had been the parties' intent, the Side Letter would have been written much differently. Accordingly, "reasonable efforts" is not automatic or prior approval.

Mr. Wold appears to have recognized this. When PacWest presented the Tri-State opportunity to Volvo in December, 2012, Volvo responded that it did not have enough time to review the transaction before the end of the year. Rather than demand immediate approval, Mr. Wold wrote that "we appreciate your position and Volvo's need for proper review, authorizations, etc." (Ex. 61.) He testified that he understood that transaction had to be approved by AB Volvo: "I was not going to tell them they can't follow their process."

Nor are "reasonable efforts" merely ministerial, such as signing necessary documents. We take notice that every manufacturer has a legitimate interest in ensuring that a proposed distributor is sufficiently funded, staffed, and equipped to effectively represent its products in its particular market. In the Side Letter, Volvo agreed to temper its normally unfettered right to control with whom it does business by agreeing to use reasonable efforts to give PacWest an opportunity to obtain the expanded territory. In light of the purpose of the Side-Letter, to grant PacWest an opportunity to expand its territory, and Volvo's interest in effective distribution of its products, the phrase reasonable efforts implies a discretionary duty to review and approve or disapprove of the territory expansion. The discretion inherent in "reasonable efforts" necessarily means that Volvo may exercise it to disapprove a transaction if PacWest's plans for the new territory materially fail to meet reasonable, articulated, and non-discriminatory standards for territory expansion.

**(4)     The Requirement of a "Similar" Dealer Agreement.**

The last sentence of paragraph 3 requires a new dealer agreement for any new territory granted, the terms of which shall be similar to those is PacWest's current Dealer Agreement. Volvo contends that there was no meeting of the minds in the Side Letter as to what would be similar to the existing agreement. Citing *American Eagle Outfitters*, 584 F.3d at 585)(citing *Lombardo*, 385 Pa. 388, 123 A.2d 663, 666 (1956)), Volvo states that to have an enforceable agreement as to what constitutes a similar agreement, "the parties had to 'articulate the material details of the bargain such that the extent of their obligations is evident on the face of the contract.'" This argument falls in light of our determination that the Side Letter and 2015 Dealer Agreement are both constituents of the parties' contractual arrangement. The material terms of a "similar agreement" are thus the material terms of the 2015 Dealer Agreement.

**III.     Did Volvo Breach of the terms of the Side Letter?**

**(1)     Did Volvo Apply the Correct Key Performance Metrics?**

PacWest approached Volvo about its desire to acquire Tri-State in December, 2021. Volvo told PacWest that it wanted to see PacWest increase its market share and sign Volvo's new standard form dealer agreement. (Sherwood Dep., 41, 61.) Although there were subsequent negotiations, including negotiations concerning two other territories, Volvo's position always was that only one metric applied – market share. (Sherwood Dep., p. 37; Roy Dep., 200-03; Wakefield Declaration.) Volvo never recognized that PacWest's obligation under the Side Letter was to meet a majority of the Key Performance Metrics as stated in Section 6.2 of the Dealer Agreement.

Because the undisputed evidence is that Volvo only considered market share, it follows that Volvo failed or refused to consider whether PacWest complied with a majority of the key performance metrics. Given our determination that the key performance metrics in the Side

Letter were those in Section 6.2 of the Dealer Agreement, Volvo's sole focus on the single metric of market share was inconsistent with the Letter Agreement and, therefore, a breach of its contractual agreement with PacWest.

Whether PacWest actually met a majority of the metrics is a different issue. PacWest asserted through Andrew Wold that Volvo never informed PacWest that it had failed to meet a majority of the key performance metrics. (Ex. 61.) We do not believe that the absence of notification from Volvo that PacWest failed to meet a majority of the metrics is sufficient, by itself, to satisfy PacWest's burden of proof. Accordingly, that is an issue that remains for trial. If it fails in that effort, Volvo cannot be liable under the Side Letter.

**(2)      Did Volvo use Reasonable Efforts?**

PacWest proposed the Tri-State territory acquisition in December, 2021. In January, 2022, Mr. Sherwood informed PacWest that if its market share continued to improve and it signed Volvo's new standard distribution agreement, he would do his best to obtain approval of the Tri-State transaction. (Sherwood Dep., pp. 41, 61.) On January 20, 2022, Volvo presented a new dealer agreement to PacWest. (Exs. 73, 74; Wold, 99.) The new-form agreement was developed in 2017. Since that time, Volvo has required dealer who wanted to expand their territory to sign the new-form agreement. (Wakefield, pp. 111-12; Sherwood, pp.134-35.)

PacWest did not accept the new-form agreement proffered by Volvo and sought to make changes. The parties failed, however, to reach agreement on the terms of an agreement for the new territories. (E.g., Exhibits 81, 87 and 90.) On March 22, 2022, Volvo sent a redline to PacWest; this version of the agreement was the final one proposed by Volvo. (Ex. 159.) On March 24, Volvo informed PacWest that the Side Letter was invalid. (Volvo Answering Statement to Am. Counterclaim, ¶ 31.) Volvo asserted that the Side Letter had been improperly assigned to PacWest (which Volvo now agrees was an incorrect position) and that the letter had

been superseded by execution of the 2015 Dealer Agreement. On May 20, 2022, Volvo filed suit in federal court in Pennsylvania to obtain a declaration that the Side Letter was invalid and unenforceable.

On August 29, 2022, Volvo informed PacWest that it does not approve the transactions with either dealer. Volvo stated that:

> PacWest . . . does not currently meet our requirements to acquire an ownership interest in any current Volvo dealership(s). Further, PacWest has a history of its inability to achieve and maintain acceptable market share in its existing Washington, Oregon, Idaho areas of responsibility. PacWest also has shown a disturbing history of uncooperativeness with VCE and has been dismissive in its dealings with VCE.

(Ex. 68.)

At the same time, Volvo informed Tri-State that PacWest does not qualify as an acquiring dealer and Volvo declines to approve the transactions. In support, Volvo cited "PacWest's ongoing inability to consistently achieve and maintain acceptable market share in its existing areas of responsibility," and its refusal "to accept the new dealership agreement that has been executed by the majority of Volvo dealers." (Ex. 69.) Volvo sent a similar letter to CMI, asserting that Volvo declined to approve the transaction based on PacWest's "inability to consistently achieve and maintain acceptable market share." It further stated that "[n]either PacWest nor JG Corp . . . is entitled to a new VCE dealer agreement 'under terms similar to the existing PacWest Dealer Agreement.'" (Ex. 70.)

In his testimony, Mr. Sherwood confirmed that Volvo decided not to approve the territories that PacWest sought because PacWest was unwilling to sign the new dealer agreement and it was a "poor performer." (Sherwood, 28-29.)

Our first task is to determine whether the evidence before us permits summary disposition of the reasonable efforts issue. Although determination of what is "reasonable"

normally would appear to be a factual question, certain undisputed facts in the record persuade us that summary disposition is appropriate.

As noted above, Volvo was entitled to exercise limited discretion in reviewing the proposed territory expansion.  Mr. Roy described Volvo's standard process as follows:

> The process would start with a selling dealer, giving us notice that they have entered into a buy-sell agreement.  And then that selling dealer would ask us for approval.  From there, we would begin to understand what the transaction would look like; stock purchase, asset purchase, ownership structure.  We would begin to understand what their intentions are as far as investments, key management personnel.  And there's normal due diligence we would do on their financials; do they have the capital structure, what is -- we would do background checks on the owners.
>
> So a typical due diligence of understanding the dealer looking to buy the structure, and then an assessment of their ability to meet targets set forth when it comes to market share and supporting customers.

(Roy dep., 48-49, 58.)

Although this general process appears unobjectionable in so far as it goes, there is no evidence that Volvo made its decision to deny approval to the territory expansion on the basis of the factors articulated by Mr. Roy.  To the contrary, the evidence clearly shows that Volvo's primary requirement for approval was securing PacWest's agreement to its new dealer agreement developed in 2017:  (i) Volvo tendered the new agreement immediately after PacWest proposed the Tri-State transaction; (ii) Mr. Sherwood testified, as noted above, that he informed PacWest that if market share continued to improve and it signed Volvo's new standard distribution agreement, he would do his best to obtain approval; (iii) Mr. Sherwood testified that Volvo denied approval because PacWest would not sign the new agreement and was a poor performer; and (iv) Volvo similarly informed Tri-State and CMI that one of the reasons for Volvo's decision not to approve was PacWest's refusal to sign the new agreement.

We do not fault Volvo for proposing that agreement or for negotiating vigorously to secure PacWest's consent.  Because the contractual standard in the Side Letter required an agreement that was "similar," not identical, to the existing agreement, the contract contemplated that negotiation would be necessary.  Indeed, at the same time the parties were negotiating the terms of the agreement for the expansion territories, PacWest proposed a new side letter that contained terms more favorable to itself.

But Volvo went further than proposing and attempting to secure PacWest's adherence to the new agreement.  It based its decision to deny approval on PacWest's refusal to accept the new agreement.  So determined was Volvo to avoid granting approval and giving PacWest an agreement similar to the existing agreement, it took the extraordinary step of disavowing the Side Letter and filing suit to secure a judicial determination that it was superseded by the 2015 Dealer Agreement.  That legal position, as noted above, was not well-founded.

The last draft of the new agreement proposed by Volvo before it disapproved of PacWest's expansion is Ex. 159.  A comparison of that draft against the existing Dealer Agreement reveals at least the following material changes from the 2015 Agreement:

(a)     Volvo reserves the unilateral right to redefine the boundaries of the dealer's territory, without compensation, to "improve service to customers or potential customers."  In (Section 1.4.1.)  The 2015 agreement has no such term.

(b)     Volvo reserves the right, "if appropriate," to make direct sales to any customers in the dealer's territory, without compensation. (Section 3.11.)  The 2015 agreement more narrowly provided for sales to key accounts and contained provisions for compensating the dealer for services rendered in connection with such sales. (Ex. 28, § 8.)

(c)     Volvo has the right to terminate at any time for convenience provided it gives 180 days' notice.  (Section 8.3.)  Volvo's termination rights in the 2015 agreement require breach by PacWest or other cause.  (Ex. 28, § 28.)

(d)     If Volvo products account for more than 50% of the dealer's business, Volvo has a right of first refusal if PacWest  wishes to sell its business.  (Section 9.3.)  There is no comparable term in the 2015 agreement.

(e)     A greatly expanded lists of actions that justify termination on reasonable notice. (§§ 8.4.1, 8.4.2.)

Volvo emphasizes that 27 of 33 dealers have accepted the new agreement. (Sherwood, 117: 24-120:21.) That is relevant to judging the reasonableness of the new agreement but does not have the probative value that Volvo suggests. No evidence was presented that other dealers had the right to an agreement that was similar to the agreement in effect in 2015. They thus lacked the contractual basis and resulting incentive that PacWest had to resist the new agreement. Moreover, their acceptance of the new agreement may speak more to their dependence on Volvo than to the similarity of the new agreement to PacWest's existing agreement. Finally, the new agreement cannot be justified as complying with section 29 of the 2015 Agreement, which allows Volvo to amend the dealer agreement provided it does so for all other dealers and the amended agreement "would not materially impact the rights and obligations of the Dealer."

The undisputed facts thus convince us that Volvo focused its decision making on securing PacWest's consent to its new agreement, the last draft of which is materially different from, and therefore not similar to, the existing 2015 Dealer Agreement.

In sum, undisputed facts lead us to the certain conclusion that Volvo failed and refused to perform under the Side Letter. Specifically, Volvo (i) erroneously disavowed the Side Letter and took the position that it had been superseded by the Dealer Agreement; (ii) disapproved PacWest's acquisition of the new territories based on the single metric of market share, not on the majority of key performance metrics as stated in paragraph 3 of the Side Letter and Section 6.2 of the Dealer Agreement; and (iii) refused to recognize that PacWest was, indeed, entitled to a dealer agreement in the new territories that was similar to its existing dealer Agreement. In

13

acting in the foregoing manner, Volvo failed to use reasonable efforts to provide PacWest with the first opportunity to acquire the additional territories.

## IV.     Is PacWest Barred from Recovering Damages?

**(1)     Is the Absence of Definitive Sales Agreements Fatal to PacWest's Damages Claim?**

PacWest seeks an order awarding it "damages and prejudgment interest for breach of contract and failure to act in good faith." (PacWest 1st Amended Counterclaim, Prayer ¶ K.). In its Motion for Summary Judgment, PacWest requests an order that, inter alia, "PacWest is entitled to damages in an amount to be determined."

Volvo contends that PacWest never had anything but non-binding letters of intent with proposed sellers of three dealerships, which are unenforceable under Pennsylvania law, and that Volvo cannot be held liable for damages on a non-binding letter of intent. (Volvo Mot. for Summary Judgment at 13.)

While PacWest might not be able to recover against the proposed selling dealers for lack of enforceable contracts, that is not dispositive of whether it might be entitled to recover damages from Volvo for interfering with the consummation of those proposed transactions if it presents sufficient proof. Such damages are similar to the damages recoverable in cases for tortious interference with prospective business relations. *See White v. George*, 66 Pa. D. & C.4th 129, 141, 2004 WL 1739862 (Pa.Com.Pl. 2004). Because Volvo has not shown that PacWest is barred as a matter of law from recovering damages on the existing record, this aspect of Volvo's motion is accordingly denied. PacWest is entitled to prove at the time of the hearing on the merits that it was damaged as a consequence of Volvo's breaches as noted in this Order.

**(2)     Does Section 18.4 of the Dealer Agreement Bar PacWest's claims for Damages?**

Section 18 of the Dealer Agreement states in its entirety:

PRODUCT LIABILTY

18.1 Unless authorized by Volvo in writing the Dealer shall not incorporate into any Volvo Product any non-Volvo Part or perform any modification to the Volvo Products, except as provided in Section 17 .2 above.

18.2 During the Contract Period and at all times thereafter, Volvo shall defend, indemnify and hold the Dealer harmless from and against all claims, demands, lawsuits, liabilities, losses, damages, costs and related legal fees, arising from damage to , or loss of, property (other than the Volvo Products) and/or personal injury and/or death ("Losses") which are attributable to the operation, use or possession of Volvo Products sold to the Dealer and caused by , or resulting from, the defective design or manufacture of such Volvo Product, provided the Volvo Product was not changed substantially from the condition it was in at the time of its delivery to the Dealer. However, said undertaking to indemnify and hold harmless the Dealer shall exclude any Losses to the extent that the Losses are attributable to the Dealer's acts or omissions as set forth in Section 18.3.

18.3 During the Contract Period and at all times thereafter, the Dealer will defend, indemnify and hold harmless Volvo from and against any and all Losses which are attributable to the operation, use or possession of a Volvo Product and caused by , or resulting from , acts or omissions of the Dealer in its possession , modification , alteration , use , demonstration, sale ,leasing, maintenance, installation or repair of the Volvo Product. However, said undertaking to indemnify and hold harmless Volvo shall exclude any Losses to the extent that the Losses are attributable to the Volvo's acts or omissions as set forth in Section 18.2.

18.4 In no event shall either party be liable to the other for claims, demands, liabilities, losses, damages, costs or related legal fees attributable to a loss of a Volvo Product or any other economic or commercial loss (except as specifically provided in Sections 18.2 and 18.3 above) or any special or consequential damages (except liability for consequential damages which cannot be disclaimed as a matter of applicable law).

18.5 At all times during and after the Contract Period, the Parties shall maintain valid and sufficient product liability insurance providing adequate compensation or reimbursement for damages, including, but not limited to, costs and expenses associated with investigation, negotiation and defense of any product liability

claims. The Parties agree to provide proof of such insurance coverage upon request.

18.6 Each Party shall give the other Party prompt written notice of any claims, demands or lawsuits which may give rise to Losses covered by Sections 18.2 and 18 .3 above . Delivery of such notice as soon as reasonably possible is a condition to the indemnities provided in those sections. The Parties shall cooperate with each other in the defense against such claims, demands or lawsuits. Failure to give the notice provided for in this Section shall result in the termination of the rights to compensation under Section 18 .2 and 18.3.

Volvo contends that subsection 18.4 of the Agreement provides for a mutual release and waiver of any and all claims for economic or commercial loss, whether attributable to a loss of a Volvo product "or any other economic or commercial loss" and thus that claims for economic or commercial loss prosecuted by PacWest in this arbitration action may not be maintained.

18.4 In no event shall either party be liable to the other for claims, demands, liabilities, losses, damages, costs or related legal fees attributable to a loss of a Volvo Product or any other economic or commercial loss (except as specifically provided in Sections 18.2 and 18.3 above) or any special or consequential damages (except liability for consequential damages which cannot be disclaimed as a matter of applicable law).

PacWest, on the other hand, asserts that this provision must be read in the context of the entirety of section 18, as referring only to products liability claims. Given these conflicting and ostensibly reasonable interpretations of this provision, the subsection must be characterized as ambiguous. Under such circumstances, we may consider general rules for contract interpretation.

First, PacWest is correct that the disputed subsection is found under the section captioned "Products Liability."  A court "may examine the [contract] headings as additional evidence tending to support the contract's substantive provisions." *Fulkerson v. MHC Operating Ltd.*, 01C–07–020, 2002 WL 32067510, at *5 (Del.Super.Ct. Sept. 24, 2002) (emphasis added) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 582 n. 35 (Del.Ch.1998)).  The title of

a section cannot contradict or rewrite the plain language of the contractual provisions within that section. "Contract headings do not constitute controlling evidence of a contract's substantive meaning." Id.; *In re G-I Holdings, Inc.*, 755 F.3d 195, 203 (C.A.3 (N.J.),2014). Therefore, some, but not dispositive, consideration may be given to the subject matter heading of product liability.

We note, however, a reasonable reading that this clause precludes economic or other commercial damages only in products liability cases would render the clause essentially meaningless, since the economic loss doctrine arguably already precludes such damages in products cases. The economic loss doctrine is a judicially created doctrine providing that a commercial purchaser of a product cannot recover from a manufacturer, under the tort theories of negligence or strict products liability, damages that are solely "economic" in nature. *See Sunnyslope,* 148 Wis.2d at 921, 437 N.W.2d 213. Since section 18.4 by its terms does not expressly apply to products liability cases, to limit its scope to such cases, as PacWest contends, would ostensibly render it nugatory, contrary to the most basic canons of contract interpretation.

On the other hand, the interpretation given by Volvo appears overly broad in that it would bar both Volvo and PacWest from seeking economic damages for any breach of the Dealer Agreement. That Dealer Agreement provides numerous obligations on the part of both Volvo and PacWest, by way of example, Section 3.6 (Volvo and the Volvo Group will manufacture, sell and deliver Volvo Products to Dealer in accordance with the terms hereof and with orders accepted by Volvo); Section 4.2 (The Dealer shall also provide Volvo with periodic reports on such matters as Volvo may reasonably request, including information relating to performance under the business plan); 4.3 (The Dealer and Volvo agree that it is of the utmost Importance that the Dealer has financial funding at levels sufficient to enable it to perform its obligations under

this Agreement and to develop its business in accordance with the objectives set forth in the business plan.)  Countless other contractual obligations are set out for the parties in this same agreement. Under Volvo's theory of this one small clause in Section 18.4, buried within six paragraphs expressly devoted to product liability claims, neither party would have any remedy against the other for any breaches of these contractual provisions.  This would effectively render these provisions, unenforceable, and lead to an absurd result.

Volvo's interpretation would also directly contradict other provisions in the same contract which expressly provide for claims for economic or commercial loss, as noted by PacWest.  For example, Paragraph 23.7 provides:

> Except as otherwise expressly set forth in this Agreement, upon termination or expiration of this Agreement in any manner and for any reason (other than a breach of the Agreement by a Party), to the fullest extent permitted by law, neither Party shall be liable to the other for compensation, reimbursement or damages of any kind or character whatsoever, whether on account of the loss by Volvo or the Dealer of prospective profits or anticipated sales, Investments or commitments made by either Party in connection with its performance under this Agreement, loss of goodwill or on account of any other losses occasioned by termination of their relationship.

A reasonable reading of this provision indicates that such damages that Volvo claims are barred by Section 18.4 are expressly available under paragraph 23.7 in the event of a breach of the Agreement. Therefore, to harmonize the two provisions, interpreting 18.4 as limited to products liability claims provides consistency in interpreting the contract as a whole.  In determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect. *Murphy v. Duquesne Univ.,* 565 Pa. 571, 591, 777 A.2d 418, 429 (2001). Thus, we will not interpret one provision of a contract in a manner which results in another portion being annulled. *LJL Transp., Inc. v. Pilot Air Freight Corp.,* 599 Pa. 546, 559–609, 62 A.2d 639, 647–48 (2009).

For the foregoing reasons, Volvo's motion for summary judgment on this issue is denied and we conclude that Section 18.4 of the PRODUCT LIABILITY Article does not bar PacWest's non-product liability claim for damages against Volvo.

## V.        The E-MOB Dispute

In a memorandum dated October 26, 2021, Volvo announced that it was "launching the first two models of its new compact electromobility ('Emob') platform." (Ex. 124.). The announcement further stated that "Volvo CE Dealers with the new-form dealer agreement will have the opportunity for exclusive distribution rights to Compact Emob products in their current AOR [Area of Responsibility]. The product line will be added as an addendum to the Volvo CE new-form dealer agreement ('Compact Emob Product Addendum')."

PacWest contends that Volvo advised PacWest that migration to Volvo's new form of agreement was a condition to PacWest being granted access to the electrically powered machine models. (PacWest 1st Am. Counterclaim at ¶ 26.). PacWest contends that neither the Product and Territory Addendum (Addendum VIII) nor any other provision of the existing Dealer Agreement considers the machine's power source to determine the scope of PacWest's exclusive right to distribute Volvo machines in its assigned territories. PacWest asks for a declaration "that PacWest is entitled to e-Mob machines under the terms of the existing Dealer Agreement." Volvo opposes that relief.

Volvo admits "that it advised PacWest that unless it accepted the new form of dealer agreement, PacWest would not be authorized to sell Volvo's current machine models equipped with electric motors and batteries instead of diesel engines and other features on an exclusive basis but could have such authority on a non-exclusive basis." (Claimant's Answering Statement to Counterclaim ¶ 25.) But Volvo subsequently stated that "despite what the 2015 Dealer Agreement states it has elected to give all remaining dealers who are interested in the compact e-

Mobility machines, including PacWest, access to those machines."  (Volvo Resp. to PacWest's

Motion for Summary Judgment at 22.)

Addendum I to the 2015 Dealer Agreement defines "Volvo Machine" as follows:

> New, unused construction equipment as designated by Volvo from
> time to time and which Dealer is authorized to sell as specified on
> the Territory and Product Addendum, Addendum IX (sic.);
> provided, however, that all other equipment manufactured and/or
> distributed by Volvo or an Affiliate (including but not limited to
> successor designs, categories and models of all such equipment)
> and not listed on Addendum IX (sic.) shall be excluded from the
> definition of the Volvo Machines.

Addendum VIII to the 2015 Agreement presents in tabular form in its Exhibits A-C, by

county and product, PacWest's appointment as the exclusive authorized dealer of Volvo

Products in each territory.  (2015 Agreement ¶ 2.1.). The "products" listed in Exhibits A-C of

Addendum VIII for which PacWest was appointed as exclusive dealer are as follows:  GPE

(General Production Equipment (large machines)), COE (compact machines), RMCOMPAL,

RMCOMPAS, RMCOMPSL, RMCOMPSS and RMHWY (the latter, road machines).  None of

the product listings specify the power source of the equipment included, whether internal

combustion or electric.

Volvo contends that the electrically powered machines are completely new, successor

designs and materially different from the products listed on Addendum VIII to the 2015

Agreement.

Given that, for example, models of machinery may change from one year to the next, it

makes little commercial sense to change the designation of products and territories to which a

dealer is appointed with every such change. Therefore, PacWest further argues that "successor

designs, categories and models of all such equipment" refers to and is limited only to equipment

"not listed on Addendum IX (sic.)"  ("Before a court will interpret a provision in a ...contract in

such a way as to lead to an absurdity or make the ... contract ineffective to accomplish its purpose, it will endeavor to find an interpretation which will effect the reasonable result intended."). *Starling v. Lake Meade Property Owners Association, Inc.*, 162 A.3d 327, 345, 640 Pa. 126, 155 (2017); *See Pocono Manor Ass'n v. Allen*, 337 Pa. 442, 12 A.2d 32, 35 (1940).

It is not clear whether products performing the same functions as previously existing products but differently powered were intended to be excluded from the definition of "Volvo Machines" in Addendum I. The definition of "Volvo Machines in Addendum I to the 2015 Dealer Agreement is therefore ambiguous and not susceptible to summary resolution.

Whether the new electrically battery-powered machines are excluded from the definition of "Volvo Machines" in Addendum I to the 2015 Dealer Agreement is a question of fact not susceptible to summary disposition.

## VI.     The Dispute over the Costs of the Federal Court Litigation.

The 2015 Dealer Agreement includes a broad arbitration clause requiring arbitration of "all actions, disputes, claims or controversies arising out of or pertaining to this agreement (including but not limited to any documents executed in connection with or in furtherance of this Agreement)." On May 20, 2022, Volvo commenced litigation in federal district court for the Middle District of Pennsylvania, notwithstanding the provisions in the Arbitration Agreement. At the time it filed suit, Volvo took the position that "the 2015 Dealer Agreement superseded the Letter Agreement...." PacWest asked VCE to withdraw its lawsuit and arbitrate. On May 31, 2022, PacWest sent an email to Volvo's counsel advising that PacWest would be filing a Motion to Compel Arbitration on Wednesday, June 1.

On June 3, PacWest rejected Volvo's proposal that withdrawal of the federal lawsuit be conditioned upon arbitrating the dispute in Asheville, N.C. and advised it would be filing its motion to compel that day. In response, Volvo's counsel advised that it would discuss with

Volvo moving the case to arbitration "without the need for the motion." After further discussion, on June 6, Volvo advised PacWest that it would unconditionally withdraw its lawsuit and adjudicate the matter through arbitration. Confirming the call, PacWest's counsel wrote:

> [B]y no later than the end of this week [June 10], Volvo will commence arbitration and dismiss its complaint pending in the Middle District of Pennsylvania. For our part, we will continue holding off the filing of PacWest's Motion to Compel Arbitration to the earlier of either Volvo performing both items, or next Monday (June 13).

On June 10, 2022, Volvo commenced arbitration, but did not dismiss its federal district court complaint. On June 14, 2022, PacWest filed a Counterclaim to Volvo's arbitration demand that requests the Panel to "[a]ward PacWest reasonable attorney's fees incurred to compel arbitration of this matter pursuant to Addendum VII, Paragraph 13 of the Arbitration Agreement." The following day, June 15, 2022, Volvo did file a Motion to Dismiss its federal lawsuit. Upon request from Volvo, the federal court issued an Order stating that "each party to bear its own costs and expenses." Upon PacWest's motion for clarification, the provision that each party bear its own costs and expenses was stricken.

The dispute between Volvo and PacWest clearly was arbitrable. Section 27.3 of the Dealer Agreement provides for arbitration of any claims "arising out of or pertaining to this Agreement (including but not limited to any documents executed in connection with or in furtherance of this Agreement)." Volvo's assertion that the Dealer Agreement superseded the Side Letter clearly reflects a dispute "pertaining" to the Dealer Agreement. Moreover, this panel has determined that Volvo erred as a matter of law when it took the position that the Side Letter was invalidated and superseded by the 2015 Dealer Agreement. Accordingly, Volvo's suit in federal court was inconsistent with arbitration provision in the Dealer Agreement.

Addendum VII, Arbitration Rules and Procedures, to the Dealer Agreement sets forth two exceptions in Paragraph 13 when a party may initiate judicial proceedings: Actions to "compel arbitration or enforce the award." Neither exception applies to Volvo's initiation of judicial proceedings in federal court. Further exceptions are noted in paragraph 14, none of which are applicable in this instance.

Paragraph 13 of the Arbitration Agreement provides that if a party improperly files a suit that frustrates the process and the counterparty prevails in enforcing or protecting the right to arbitrate, the prevailing party is entitled to its fees and costs incurred to enforce its arbitration rights:

> If a party to the Agreement files an action or claim seeking to avoid, negate or frustrate the arbitration process agreed upon herein, the prevailing party shall be awarded all such costs, including attorney's fees paid to the prevailing party's counsel, to enforce or protect the prevailing party's rights under this Addendum. The right afforded under this paragraph is independent of the rights afforded by paragraph 12 above. Regardless of whether a party is deemed a 'prevailing party' on the merits of its claim, the party shall be awarded its costs if it prevailed in requiring that all disputes subject to arbitration hereunder arbitrated in accordance with this arbitration agreement.

Volvo's federal court action had the effect or purpose of avoiding and frustrating the arbitration process. PacWest, therefore, is entitled to costs and fees under paragraph 13. Nonetheless, PacWest prevailed in persuading Volvo to voluntarily dismiss the federal court action. Therefore, the legal question is whether PacWest can be considered a prevailing party for purposes of entitlement to fees and costs under Paragraph 13 to the Arbitration Agreement addendum. In this instance, this provision in the arbitration agreement was clearly intended to prevent and discourage a party from unreasonably and improperly commencing litigation for matters that fell within the arbitration agreement. PacWest, through its counsel, was forced to incur fees and costs to prevail upon Volvo to abide by the terms of the arbitration agreement and

23

voluntarily dismiss its federal court action.  Those fees and costs were expended "to enforce or protect  [PacWest's] rights under this Addendum" are therefore, awardable to PacWest as the prevailing party.  *See In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 465 n.10 (3d Cir. 2000) ("Cohen also argues that because his motion to voluntarily dismiss his case without prejudice was granted, the Defendants were not the "prevailing party" for Rule 54(d)(1) purposes. This argument runs contrary to the majority rule that defendants can be "prevailing parties" when a plaintiff voluntarily dismisses his action without prejudice."); *Citizens Sav. Ass'n v. Franciscus*, 120 F.R.D. 22, 26–27 (M.D.Pa.,1988) ("dismissals without prejudice should be allowed when no harm will result to the defendant or when curative conditions can alleviate any harm incurred by the defendant. In the present case, the remaining defendants have established only financial prejudice, *i.e.,* their attorney's fees and costs in defending this action.")

For the foregoing reasons, pursuant to provisions of the arbitration agreement, PacWest is entitled to its reasonable attorneys' fees and costs associated with the federal court action to enforce its rights under the agreement.

## VII.    Summary of Rulings and Issues for Evidentiary Hearing.

The Panel rules as follows:

A.      Volvo's motion for summary judgment is denied.

B.      PacWest's motion for summary judgment is granted in part and denied in part as follows:

    (1)      Granted with respect to paragraphs 58 and 59 of PacWest's Amended Counterclaim.  We hold that Side Letter is a valid and enforceable agreement between Volvo and PacWest.

    (2)      Denied with respect to paragraph 61 of PacWest's Amended Counterclaim which seeks a ruling that PacWest has sufficiently met the majority of the

key performance metrics contained in paragraph 3 of the Side Letter. PacWest bears the burden of proving at the arbitration hearing on the merits that it met the majority of the key performance metrics.

(3) Granted with respect to paragraph 62 of PacWest's Amended Counterclaim which seeks a ruling that Volvo failed to make reasonable efforts to offer PacWest a first opportunity to acquire the additional territories.

(4) Granted with respect to paragraph 63 of PacWest's Amended Counterclaim which seeks a ruling that PacWest was entitled to a dealer agreement for the additional territories that was similar to the existing 2015 Dealer Agreement.

(5) Granted with respect to paragraph 64 of PacWest's Amended Counterclaim which seeks a ruling that the form of agreement presented to PacWest was not similar to the 2015 Dealer Agreement.

(6) Denied with respect to paragraph 66 of PacWest's Amended Counterclaim which seeks a ruling that PacWest is entitled to Emob machines under the terms of the 2015 Dealer Agreement. The e-Mobility dispute cannot be resolved on summary judgment. It remains an issue for the arbitration hearing on the merits.

(7) Granted with respect to PacWest's request for dismissal of Section F of Volvo's request for declaratory Judgment. We hold that Section 18.4 of the 2015 Dealer Agreement excludes recovery of economic and commercial losses flowing from product liability claims but not damages

25

that might flow from Volvo's breach of the terms of the Letter Agreement. PacWest has the burden of proving at trial the existence and extent of such damages.

C.    We find that PacWest is entitled to recover under Section 13 of the 2015 Dealer Agreement its costs and attorneys' fees incurred in the federal court litigation initiated by Volvo. Nothing in this Order determines who may be entitled to recover costs and attorneys' fees except as stated in the immediately preceding sentence.

## VIII.  Further Proceedings.

A status conference for April 17, 2023, was scheduled in Order No. 2.  By April 12, the parties should submit to the panel their proposals for the schedule leading to the hearing on remaining issues beginning June 5.  The proposals should address dates for completion of damages discovery, exchange of expert opinions, identification and exchange of hearing exhibits, identification of witnesses for the nearing, pre-hearing briefs, and any other pertinent matters.

April 7, 2023

| | |
|---|---|
| _Gerry Saltarelli_ | _William H. Knull, III_ |
| Gerald G. Saltarelli, Chair | William H. Knull, III<br>Except as set forth in the partial<br>dissent below. |

_John P. Erlick_

Hon. John P. Erlick (Ret.)

**Statement of Partial Dissent by William H. Knull, III**

I must regretfully dissent from that part of the Order resolving dispositive motions listed as points B (3), (4) and (5). Because aspects of this case must be referred to a hearing on the remaining issues, I will briefly summarize the reasons for my dissent below.

1. As the majority acknowledges, reasonableness is normally a factual question. Its determination requires consideration and balancing of all relevant facts, not individual facts considered in isolation. As such it is in my view uniquely unsuitable for summary disposition. The majority grounds its decision on its finding that "the undisputed evidence is that Volvo only considered market share" (Order at 9), as well as PacWest's refusal to sign Volvo's new form of dealer agreement, and thereby breached its contractual obligation to "make reasonable efforts to offer JGC a first opportunity to acquire the additional territory." No direct, particularized evidence was presented, by either side, of Volvo's actual review of factors affecting its decision not to approve the extension of PacWest's territories. The majority relies on summary statements by which Volvo expressed its conclusions, which are certainly entitled to consideration, but those statements are hardly conclusive as even that evidence is not without contradictions: the majority itself quotes the testimony of Mr. Sherwood who says that "Volvo denied approval because PacWest would not sign the new agreement <u>and was a poor performer</u>." (Order at 11-12 (emphasis added) *see also* Ex. 68 (Volvo 8/29/22 Volvo ltr. To PacWest (Order at 10) "PacWest also has shown a disturbing history of uncooperativeness with VCE and has been dismissive in its dealings with VCE.").)

In describing Volvo's internal processes, Mr. Roy testified that, in addition to the structure of the proposed purchase transaction, Volvo

… would do background checks on the owners.

So a typical due diligence of understanding the dealer looking to buy the structure, and then an assessment of their ability to meet targets set forth when it comes to market share and supporting customers.

(Order at 11, (quoting (Roy dep., 48-49, 58).)  While summary in form, that testimony is entirely inconsistent with the conclusion that, in considering a dealer with whom Volvo had done business for some seven years, its decision not to expand the relationship was based exclusively on failure to meet target market share, as important as that measure may have been.

2.      The majority acknowledges that "every manufacturer has a legitimate interest in ensuring that a proposed distributor is sufficiently funded, staffed, and equipped to effectively represent its products in its particular market."  (Order at 7.)  PacWest's performance and capabilities were well known.  After all, PacWest had operated for nearly seven years as Volvo's exclusive representative in its assigned territories.  PacWest acknowledged at the hearing on dispositive motions that target numbers for various measures of its performance were agreed upon by the parties every year as part of an agreed business plan and that PacWest's performance against those targets was reported and reviewed at year end by Volvo and PacWest.  Neither side offered particularized proof of those targets or PacWest's performance in relation to those targets or of any overall assessment by Volvo of that performance, leaving this tribunal in the dark as to what that evidence would show.  However, the absence of that proof casts substantial doubt on PacWest's contention that it is undisputed that Volvo unreasonably failed to consider PacWest's overall performance or its performance against "Key Performance Measures" in deciding not to extend its exclusive territory further.

3.      The majority's conclusion that Volvo's denial of PacWest's request for new exclusive territories resulted solely from PacWest's refusal to sign the new dealer agreement cannot alone establish undisputed evidence of unreasonableness.  It is undisputed that PacWest was not "pre-approved" or otherwise contractually entitled to expand its exclusive territories.

2

The Side Letter stated that any such new territory would require a new dealer agreement, that would be similar to the old one.  But in the absence of a contractual right to a new territory, PacWest had no right to even a "similar" agreement.  Volvo is in the business of manufacturing heavy machinery, which it sells through a nationwide network of dealers with exclusive rights to sell in their designated territories.  Volvo had done business with PacWest for nearly seven years.  82% of its existing dealers had accepted Volvo's new form dealer agreement.  Volvo manifestly did not want to extend PacWest's exclusive relationship further.  The record plainly does not establish as undisputed fact that PacWest's refusal to agree to Volvo's new dealer agreement was the only reason, much less an indisputably unreasonable reason for Volvo's unwillingness to extend its relationship.

4. For all of these reasons, I respectfully dissent from (a) the majority's finding that Volvo breached its obligation to make reasonable efforts to offer PacWest a first opportunity to acquire new territories as require by the Side Letter; (b) the majority's finding that "PacWest was entitled to a dealer agreement for the additional territories that was similar to the existing 2015 Dealer Agreement; and (c) that the proposed form of agreement tendered to PacWest was not similar to its original agreement, on the grounds that that issue is moot given that PacWest was not entitled to acquire a new territory and that it therefore had no entitlement to a new agreement, similar or otherwise.