# EXHIBIT 1

 AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

Northeast Case Management Center
Elizabeth Corsetti, JD
Assistant Vice President
1301 Atwood Avenue
Johnston, RI 02919

September 25, 2024

Billy M. Donley, Esq.
Baker & Hostetler, LLP
811 Main Street, Suite 1100
Houston, TX 77002
Via Email to: bdonley@bakerlaw.com

Steven Caplow, Esq.
Davis Wright Tremaine, LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104-1610
Via Email to: stevencaplow@dwt.com

Case Number: 01-22-0002-4846

Volvo Construction Equipment North America, LLC
-vs-
PacWest Machinery, LLC

Dear Counsel:

By direction of the arbitrators, we transmit to you the duly executed Partial Final Award in the above matter.

Please note, the AAA WebFile® Electronic Case Filing Guidelines still applies to this dispute. The AAA requires the parties to use AAA WebFile®  to file online their pleadings, including claims, counterclaims, answers, motion briefing, pre- and post-hearing briefs, and other substantive filings. To e-file or view documents on AAA WebFile, case participants must have an active AAA WebFile account and must have previously filed a notice of appearance or otherwise appeared in the case. If you have any questions, please refer to the AAA WebFile® Electronic Case Filing ("ECF") Guidelines FAQ or contact your case manager.

As always, please do not hesitate to contact me if you have any questions.

Sincerely,

Julie M. Molloy
Manager of ADR Services
Direct Dial: (401)431-4834
Email: JulieMolloy@adr.org

Enclosure

cc: Sarah A. Benedict, Cris Stevens, David R. Jarrett, Esq., Jennifer Green, Hon. John P. Erlick (ret.), William H. Knull, III, Esq., Gerald G. Saltarelli, Esq.

**AMERICAN ARBITRATION ASSOCIATION**

**Commercial Arbitration Tribunal**

In the Matter of the Arbitration between

    VOLVO CONSTRUCTION EQUIPMENT
NORTH AMERICA, LLC,

        Claimant,

v.                           No.  01-22-0002-4846

    PACWEST MACHINERY, LLC,

        Respondent.

**PARTIAL FINAL AWARD**

WE THE UNDERSIGNED ARBITRATORS, having been duly appointed pursuant to an agreement dated December 17, 2015, between Claimant, Volvo Construction Equipment North America, LLC ("Volvo"), represented by Billy M. Donley and David R. Jarrett, Baker & Hostetler LLP, and Respondent, PacWest Machinery LLC ("PacWest"), represented by Steven P. Caplow and Sarah A. Benedict, Davis Wright Tremaine LLP, having been duly sworn, and having heard the proofs and allegations of the parties, hereby enter the following Partial Final Award.

**PROCEDURAL HISTORY**

In Order No. 3, the panel found that the Side Letter was valid and enforceable; the key performance metrics ("KPMs") referred to in the Side Letter were those in Section 6.2 of the

No. 01-22-0002-4846

2015 Dealer Agreement; and Volvo breached the terms of the Side Letter when it disapproved of PacWest's acquisition of three selling dealers. We further determined that PacWest had the burden of proving that it met the KPMs, and, as stated in Order No. 6, "the meaning and measurement of those metrics" were factual questions reserved for the final hearing on the merits.

In the briefing leading up to Order No. 3, the parties sought summary disposition of PacWest's alleged right to sell E-MOB machines under its existing Dealer Agreement.[1] We found that the dispute over E-MOB machines was not susceptible to summary disposition, and, accordingly, reserved that dispute for the final hearing.

Paragraph 12 of Addendum VII of the 2015 Dealer Agreement provides for recovery of attorneys' fees and costs by the prevailing party. On September 26, 2023, the panel reserved the recovery of attorneys' fees until after resolution of the merits of the parties' disputes.

An in-person hearing on the merits took place on March 11 – 15, 18, and 19, 2024. Prior to the commencement of the hearing, we re-aligned the parties such that PacWest was deemed the claimant and Volvo was deemed the respondent.

Post-hearing briefing was completed by June 24, 2024, and closing arguments were held by remote video on July 18, 2024.

**DISCUSSION**

I. **DID PACWEST SATISFY ITS BURDEN OF PROVING COMPLIANCE WITH A MAJORITY OF THE KEY PERFORMANCE METRICS?**

A. **Overview of Key Issues in this Hearing.**

In Order No. 3, we stated:

---

[1] The parties actually entered into three identical dealer agreements for each of three separate territories granted to PacWest.

No. 01-22-0002-4846

> In sum, undisputed facts lead us to the certain conclusion that Volvo failed and refused to perform under the Side Letter. Specifically, Volvo (i) erroneously disavowed the Side Letter and took the position that it had been superseded by the Dealer Agreement; (ii) disapproved PacWest's acquisition of the new territories based on the single metric of market share, not on
>
> the majority of key performance metrics as stated in paragraph 3 of the Side Letter and Section 6.2 of the Dealer Agreement; and (iii) refused to recognize that PacWest was, indeed, entitled to a dealer agreement in the new territories that was similar to its existing dealer Agreement. In acting in the foregoing manner, Volvo failed to use reasonable efforts to provide PacWest with the first opportunity to acquire the additional territories.

(Order No. 3, pp. 13-14.)

We ordered an evidentiary hearing on whether PacWest satisfied the key performance metrics, with PacWest bearing the burden of proof. PacWest claims that it met the metrics in two ways. First, it contends that Volvo waived the obligation that PacWest prove it met the metrics because Volvo failed to specifically define how the metrics would be measured and what would be considered satisfactory completion. Second, PacWest offered the evidence presented through its expert, Neal Beaton, who sought to show satisfaction of the metrics through data supplied by Volvo to PacWest in various formats.

Volvo denies it waived PacWest's obligation to prove compliance with the metrics, denies that they have any concrete meaning, and, in fact, are "unknown' and "unknowable"; in any event, Volvo contends that PacWest failed to prove that it satisfied a majority of the metrics.

PacWest asserts that having carried its burden of proving that it complied with a majority of the KPMs, Volvo was obligated to use reasonable efforts to provide it with a first opportunity to expand but Volvo wrongfully and in breach of the contract refused to approve the acquisitions that PacWest had negotiated with Tri-state, CMI, and Great West. Volvo contends that it acted reasonably pursuant to its standard practice of refusing expansion by dealers achieving less than

3

No. 01-22-0002-4846

Volvo's dealer average 10% market share. Volvo argues for numerous reasons that the transactions with the selling dealers could and would never have closed such that PacWest is not entitled to any damages.

Finally, Volvo asks us, based on the full record of the evidentiary hearing, to reverse certain aspects of Order No. 3.

### B. Negotiation of the Key Performance Metrics.

The Side Letter states that, "provided [PacWest] is meeting a majority of the mutually agreed key performance metrics in the current territory," Volvo has the obligation to "make reasonable efforts to offer [PacWest] a first opportunity to acquire additional territory . . . ."

Before Joshua Green Corporation closed on the acquisition of ClydeWest, and the consequent formation of PacWest, Volvo's standard form dealer agreement provided in section 6.2 that the "quantity of Volvo Machines ordered and paid for by the Dealer" and the "market share of the Volvo Products within the Territory will be the principal factors in evaluating the Dealer's performance." (Ex. 15.) Mr. Wold of PacWest added to this that "[a]dditional metrics may include the Dealer's customer service levels, profitability, safety performance, staff training and readiness, sustainability, and other measurements as may be agreed from time to time." (Ex. 15.) Counsel representing Volvo testified that although he did not understand the terms Mr. Wold inserted, he did not object to them as they did not appear "troublesome." (Tr. 3/15, 193-94.) He additionally testified that he had no discussion with Mr. Wold as to what the words Wold had added to the agreement, and which counsel accepted, meant. (Tr. 3/15, 205-06.) Further drafts of the Dealer Agreement show that before execution, the parties deleted the reference to the quantity of machines purchased and market share being the "principal factors" in evaluating dealer performance, as well as the additional metric of "sustainability."

4

No. 01-22-0002-4846

The evidence thus shows that the parties specifically negotiated the wording of the key performance metrics. The evidence further shows, however, that there was no effort by either party to negotiate specific details of the metrics, such as how each one was to be measured over what period of time. In fact, Volvo's lawyer testified that he thought if the metrics were ever going to be measured, Mr. Wold "would put forth a plan." (Tr. 3/15, 208.) He also thought (to himself) that market share still would be the primary metric despite deletion of that wording from Volvo's standard form agreement. (Tr. 3/15, 208.)

Once the Dealer and Letter Agreements were signed, neither Volvo nor PacWest, nor their lawyers, had any further discussion of the key performance metrics in the context of the Section 6.2 of the Dealer Agreement or the Side Letter. Neither party sought to more specifically define the metrics or reach an understanding of how they would be measured.

**C. Volvo Ignored the Key Performance Metrics.**

When PacWest notified Volvo of the prospect of its expansion through the acquisition of Tri-State, Great West, and CMI, Volvo reacted, as noted in Order No. 3, by focusing on the single metric of market share. Volvo's evidence showed that PacWest's market share remained considerably below the average share of dealers in Volvo's national network throughout the seven years of PacWest's Volvo dealership, met PacWest's 9% target share only on two isolated monthly occasions and never achieved the 10% share that Volvo's witnesses testified it always requires for expansion. Concluding that PacWest was an under-performer judged by that metric, and unwilling to expand the exclusive territory of a dealer that had proved an unsuccessful competitor in its existing area, Volvo denied approval of the proposed transactions.

The evidence received at the hearing from Stephen Roy and Patrick Wakefield confirms that Volvo focused on market share and made no effort to quantify or even discuss with PacWest

5

No. 01-22-0002-4846

its performance in terms of the other four metrics. Instead, Volvo claimed that the Letter

Agreement was invalid and sued to obtain a judicial determination to that effect. In this case,

Volvo continues its attack on the KPMs, contending that they are unknown and, in fact,

unknowable. Consistent with that position, Volvo did not offer affirmative evidence that

PacWest had not satisfied any of the metrics other than market share, although its expert, Tiffany

Lewis, challenged PacWest's analysis on the issue of compliance with the KPM's.

### D. Did Volvo Waive PacWest's Obligation to Prove Satisfaction of the KPMs?

PacWest argues that since the KPMs form a condition precedent for the benefit of Volvo,

Volvo's failure to specifically define them in terms of measurement and relevant time period acts

a waiver of PacWest's obligation to satisfy a majority of them.

We agree that the metrics in section 6.2 form a condition precedent – if PacWest fails to

meet that condition, Volvo is relieved of any obligations stated in the Side Letter with regard to

expansion. As the condition precedent is for the benefit of Volvo, Volvo's failure to seek greater

specificity for the metrics it now claims are incomprehensible, or to create its own measures of

those metrics, may be considered a waiver of, or estoppel to assert, any argument that the metrics

are so lacking in content that they cannot be enforced, or that the data that Volvo routinely

supplied to PacWest on its performance cannot be considered in measuring whether the KPMs

were satisfied. *Quinn Construction, Inc. v. Skanska USA Building, Inc.*, 730 F. Supp. 2d 401.

420-21 (E.D. Pa. 2010); *Connelly Constr. Corp. v. Travelers*, 2018 WL 3549281, at *4 (E.D. Pa.

July 24, 2018).

In addition to waiver, Volvo's actions in 2021 and 2022 may be viewed in terms of

breach of contract. When Volvo was confronted with PacWest's requests for approval of the

proposed expansions, Volvo followed its standard practice of judging expansion by the single

6

No.  01-22-0002-4846

metric of performance as measured by market share.  In so doing, Volvo wholly disregarded that it had entered into an agreement with PacWest that relegated market share to just one of six metrics.  Because Volvo ignored the metrics, and took the position that the Letter Agreement is unenforceable, and thereby breached the Letter Agreement at the outset, Volvo is not now in position to complain that PacWest failed to prove its satisfaction with the contract terms that Volvo ignored.  See *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 599 Pa. 546, 962 A.2d 639, 648 (2009) ( if a breach constitutes a material failure of performance, the non-breaching party is relieved from any obligation to perform; thus, a party who has materially breached a contract may not insist upon performance of the contract by the non-breaching party – in this case compliance with the KPM's.)

Accordingly, we find that Volvo's prior breach relieves PacWest of the need to prove satisfaction of the KPMs.  Nevertheless, we will proceed to determine, without regard to estoppel or Volvo's breach of contract, whether PacWest proved, as a factual matter, its satisfaction of the KPMs.

### E.  The KPMs Have Ascertainable meanings.

Volvo contends that without agreement as to how the metrics were to be measured, they are essentially meaningless.  Its argument may be cast either that there was no actual agreement as to the metrics or that there is no way the purported metrics can actually be applied to the question of PacWest's performance.  Either way, Volvo contends that the KPMs are so lacking in substance as to be incapable of ascertainment.

We disagree with Volvo's conclusion.  In our judgment, the additional metrics added by PacWest and agreed to by Volvo – customer service levels, profitability, safety performance, and staff training and readiness – are terms customarily used in industry generally and in distribution

7

No. 01-22-0002-4846

relationships in particular. The fact that additional specificity would be helpful, or that judgment is necessary as to how they are applied, does not make the parties' choice of language unenforceable. It may be noted that the Dealer Agreement contains many terms with the same or even less that level of specificity used in the additional KPMs. Moreover, the metrics selected were, in general terms, well known to Volvo, which regularly provided its dealers with a stream of data on numerous aspects of dealer performance.

In determining the meaning of the Dealer and Letter Agreements, we may additionally look to the parties' course of performance after signing the agreements. Under Pennsylvania law, "course of performance is always relevant in interpreting a writing." *Atl. Richfield Co. v. Razumic*, 390 A.2d 736, 741 (Pa. 1978); accord, Restatement (Second) of Contracts § 202(4) and Comment a (1981). *See also, AstenJohnson v. Columbia Cas. Co.*, 483 F. Supp. 2d 425, 467–68 (E.D. Pa. 2007), *aff'd in part, rev'd in part sub nom. AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213 (3d Cir. 2009) ("A court should consider the course of performance no matter whether the language of the contract is ambiguous or unambiguous.").

After the inception of the agreements, Volvo continued to provide PacWest with the customary stream of performance data that Volvo routinely provided to its other dealers. This information measured numerous aspects of the dealers' business, from market share for every line of business, financial performance, parts ordering, product development and updates, and safety issues. Although the labels affixed to the information routinely developed and provided to PacWest did not precisely match the names of the KPMs, certain of the information provided clearly relates to those metrics. Accordingly, we conclude that the information that Volvo developed for PacWest, whether provided to PacWest for its own information or as part of

8

No. 01-22-0002-4846

optional incentive programs, may be considered in determining whether PacWest satisfied a

majority of the KPMs.

Volvo does not deny that it routinely provided performance data to PacWest and its other

dealers. It argues, instead, that such information was not generated in connection with or for the

purpose of Section 6.2 of the Dealer Agreement or the Side Letter. Specifically, Volvo's Ryan

Sherwood, former head of Dealer Development, declared in pre-hearing proceedings that

although "VCE has data points and shares data with its dealers,"

> VCE does not have any programs of any nature regarding
> 'customer service levels, profitability, safety performance, [or]
> staff training and readiness' *for purposes of 6.2* or, for example,
> programs as to how those items are supposed to be measured,
> when to measure them, for what period, or what standard(s) were
> to be applied to measure those items *for purposes of 6.2* of the
> dealer agreement.

(Ex. 752, ¶ 7; emphasis added.)

That Volvo failed or refused to develop programs specifically identified to the metrics in

the Dealer Agreement is not a defense for Volvo. Volvo knowingly accepted the six

performance metrics as part of its contract with PacWest. Those six terms govern important

rights of the parties: in the case of PacWest, its satisfaction of the metrics triggers Volvo's

obligations in connection with PacWest's potential expansion into additional territories. Volvo

cannot now defeat the very terms it agreed to by its own failure to implement them through

programs it now claims are necessary. Volvo is understandably unhappy with the contract it

agreed to. We, however, cannot depart from it.

**F. PacWest Presented Sufficient Evidence of its Compliance with the KPMs.**

(1)    **Motion to Exclude Testimony of PacWest's expert.**

9

No.  01-22-0002-4846

Preliminarily, the panel notes that on several occasions, Volvo sought to exclude or limit the testimony of PacWest's expert, Neil Beaton.  The panel reserved on this issue until after it could consider the substance and basis for his expert testimony.

Rather than exclude evidence as Volvo requests, after hearing the witnesses and considering the extensive documentary evidence, the panel prefers to accept the record, according the evidence such credibility and weight as the panel deems justified based on the record as a whole, as reflected in the discussion of individual issues.  We note that Pennsylvania law applies a more flexible standard to allowing expert testimony in a bench trial where the trier of fact can consider the expert opinions and determine whether they are supported and reliable. "In the context of preparing for a bench trial, it is not necessary to apply the Daubert standard with full force in advance of trial. Rather, the court has the flexibility to allow testimony provisionally and revise its view once the testimony is taken." *Alco Indus., Inc. v. Wachovia Corp.*, 527 F. Supp. 2d 399, 405 (E.D. Pa. 2007); *Gannon v. United States*, 571 F. Supp. 2d 615, 616 (E.D. Pa. 2007) ("In a bench trial, th[e] Court's 'role as gatekeeper pursuant to Daubert is arguably less essential' because a judge rather than a jury is the fact finder.")

In Volvo's initial motion to strike PacWest's expert, Neil Beaton, it sought to exclude Mr. Beaton on the basis that his opinions constituted legal opinions and further that he lacked the qualifications, experience, training, and background to opine on whether PacWest satisfied any of the KPMs. Additionally, Volvo claimed that the data that Mr. Beaton relied upon was not reliable and further claimed that he "cherry-picked" data points that were favorable to his analysis.  Finally, Volvo objected to Beaton using the IBIS World report as support in estimating PacWest's future cash flow growth.

10

No. 01-22-0002-4846

Addressing the first of these issues, PacWest responds that the arbitration panel itself noted that "the meaning of measurement of those metrics, as well as PacWest's performance compared to such metrics, are factual questions reserved for the hearing scheduled to begin October 16, 2023." (Order No. 6, at 1.) Accordingly, Mr. Beaton's opinions with respect to whether or not PacWest met the KPM's addresses factual issues and not legal conclusions.

With respect to Volvo's past challenges to Mr. Beaton's qualifications and methodology, the panel has done precisely what it said it would do: listen to Mr. Beaton's analysis and opinions and the criticism of those opinions by Volvo witnesses, and its own expert, Tiffany Lewis, and consider the data and evidence supporting Beaton's and Lewis' views. Having considered the testimony of both experts and reviewing the testimony of all of the other witnesses as well as the evidence admitted at the hearing, the panel concludes that Mr. Beaton was qualified to testify and that he has the experience, training, and background to opine on whether PacWest satisfied any of the KPMs. Additionally, Volvo was afforded full opportunity to challenge Mr. Beaton's analysis through its own expert as well as lay witnesses. Finally, for the reasons stated in the substantive opinion below, the panel concludes that the methodology relied upon by Mr. Beaton was reliable and credible.

For the foregoing reasons, Volvo's motion to exclude Mr. Beaton's testimony on the issues of the KPM's and on his methodology in calculating damages is denied.

(2)    **Evidence Relating to Compliance with KPMs.**

As noted, PacWest sought to demonstrate that it met a majority of the KPMs through the opinions and analysis of Mr. Beaton. His testimony was supported by that of Jolene Logue who identified the information and programs from Volvo that she believed related to the KPMs in Section 6.2.

11

No.  01-22-0002-4846

Volvo asserts that because the parties never specifically defined the KPMs other than market share and never agreed how those metrics would be measured, they cannot be applied to measure PacWest's performance.  Volvo further contends that it approves territorial expansion only when the acquiring dealer has at least a double-digit market share, which is the national average for Volvo Construction Equipment dealers.  As PacWest's market share was under 10%, it was an under-performer and would thus not qualify for expansion.

Quantity of Machines Purchased and Market Share:  The initial metrics in section 6.2 are quantity of Volvo Machines ordered and paid for and market share of Volvo Products within the Territory.  As to the former, Mr. Beaton presented evidence of Volvo's recognition of PacWest as being entitled to benefits associated with the Level 2, the highest level, of Volvo's machine ordering policy.  Volvo points out that the policy relates to the process of ordering machines, not to the quantity of machines ordered.  Mr. Wakefield testified, however, that the quantity of machines purchased is actually a part of market share: to achieve market share goals the dealer has to buy sufficient numbers of machines, taking into account the long lead times for equipment of this type.  In this sense, the ordering policy relates to the quantity of machines purchased.   In any event, Volvo offered no evidence that it ever provided its dealers with any information on quantity of machines purchased other than the ordering policy geared to the dealer's achievement of its market share goals.  We therefore accept that PacWest's achievement of Level 2 in the ordering policy is sufficient evidence of its satisfaction of the quantity metric.

Although PacWest had been in operation as Volvo dealer since 2015, Beaton looked at PacWest's market share performance only against its annual PDP goals for 2021 and 2022.   In

No. 01-22-0002-4846

those years, PacWest's agreed goal in terms of GPE TOT[2] was 9%, which PacWest achieved in

December of each year. Beaton justified the use of annual data on the ground that the Dealer

Agreement mandates an annual business plan and market share that is measured in December is

consistent with Section 6.2's requirement that market share be measured on a rolling twelve-

month basis.

Volvo reported market share data to its dealers every month. Volvo dealers' average

market share nationwide is approximately 10%. For 2021 and 2022, Volvo would not accept a

PDP goal for any dealer of less than 8.5%; hence, PacWest's goal was 9%. Although PacWest

managed to meet that goal in the two months at the end of each year he considered, Mr. Beaton

ignores PacWest's lesser performance during all the other months of those years. Mr.

Wakefield's Declaration shows PacWest's market share on a rolling twelve-month basis, as

required by section 6.2 of the Dealer Agreement, from January 2021 through September 2022.

For those twenty-one months, PacWest's GPE TOT is at or above 9% only five times. Volvo's

Wakefield explained:

> As the [attached] chart shows, PacWest achieved 9.2% YTD and
> Rolling 12 month GPE TOT market share in by the end of
> December 2021. PacWest did not sustain that market share into
> 2022, nor had it ever reached that market share in the past since it
> became a Volvo dealer. Although the VCE dealer network entered
> January 2022 with a GPE TOT market share of 10.2% and
> although the VCE dealer network sustained their GPE market
> share each month thereafter to September 2022, PacWest's GPE
> market share remained significantly under its December 2021
> 9.2% level throughout January to September 2022.

(Ex. 753, Wakefield Decl. ¶ 4).

---

[2]  Volvo developed and provided market share data for each line of business. The evidence shows, however, that a single number was generally used to denote market share performance. GPE refers to General Purpose Road Equipment and TOT means "transfer of title," referring to machines sold in contrast to those placed in rental service.

No. 01-22-0002-4846

Moreover, PacWest's market share over the seven years of its Volvo dealership consistently fell far below the 10% average share achieved by Volvo's national dealer network, and thus below the market penetration that Volvo expected of applicants for additional dealerships or territories. Notwithstanding PacWest's achievement of a 9% share in the final two months of 2021 and 2022, the earlier data suggests that PacWest was consistently under-performing from a market share perspective. Mr. Wakefield testified that of thirty-three dealers in its network, only four or five had market shares as low as 8% to 9%. Mr. Beaton's evidence did not address PacWest's earlier deficient performance.

The evidence shows that Volvo never accepted compliance with the PDP goal as satisfaction of market share for purposes of expansion. Volvo took the position, which the evidence supports, that it would consider allowing expansion only for dealers that had market share of 10% of greater. Its reasoning was that dealers that were under-performing in their existing territory could not be expected to improve their performance in an even larger territory. Although Volvo offered evidence that it orally informed its dealers of this policy, Ms. Logue, who had worked for Volvo and now was president of PacWest, denied ever knowing of Volvo's position on expansion. Nevertheless, Beaton's analysis, as noted immediately above, fails to establish consistent market share performance even when measured by the lower 9% level contained in the PDP. Therefore, we conclude that PacWest did not meet the market share metric.

Profitability: Mr. Beaton measured profitability in two different ways. First, he compiled a list of credit limits and related pricing that Volvo Financial Services ("VFS") provided to PacWest from 2015 through 2022. Beaton opined that the increasing limits and

14

No.  01-22-0002-4846

decreasing pricing reflected Volvo VFS' judgment that PacWest was a profitable dealer.  In the second, Beaton examined profitability as shown by PacWest's financial statements.

We see only a tenuous connection between credit terms extended by VFS and the profitability of PacWest.  Certainly, credit terms relate to profitability but equally certainly, they are not a direct measure of profitability.   Nor are we convinced that the favorable credit terms on which Beaton relies are indicative of increasing profitability.  Beaton's analysis fails to consider whether the declining cost of debt PacWest experienced in 2021 and 2022 was the result of macro-economic factors, such as the flood of credit into the markets as result of the global pandemic that began in 2020.

Beaton's second measure of profitability stands on firmer footing.  Here he looked at gross profit margin in 2021 and 2022 of 19.7% and 20%; pre-tax margin of 3.9% and 3.3%; and return on equity of 13.2% and 11.4%, respectively, and opined that PacWest was a profitable dealer.  (Beaton Report, Ex. 325, ¶ 43 and Table 9.)

The difficulty here is that Mr. Beaton did not compare PacWest's profitability to that of any other Volvo dealers, but he said that Volvo did not provide the data; nor did he present any comparative information on equipment dealers generally.  Volvo cross-examined Mr. Beaton on Ex. 449, a Network Benchmark Report for September 2022.  In this report, Volvo compared PacWest's financial performance against other Volvo dealers.  In certain areas, PacWest met Volvo's Excellence Target; in certain others, it did not.  For example, in the "Key Performance Metrics" section, PacWest met the Excellence target for EBITDA and gross profit but failed to meet it for pre-tax profit.

Although Volvo cross-examined Beaton on this arguably conflicting information, neither Volvo personnel nor its expert affirmatively made the case that PacWest was not a profitable

15

No. 01-22-0002-4846

dealer or that it was so deficient in profit generation that it could not be expected to perform if it acquired the additional territories. In the absence of affirmative contrary evidence, we believe that Mr. Beaton's opinion that PacWest was profitable is sufficient to demonstrate that PacWest satisfied the profitability KPM.

The final three metrics are more straightforward. For Dealer's Customer Service Levels, Beaton looked at the Customer Satisfaction Index which is an element of an optional incentive program. The Customer Service Index is based on surveys of the dealer's customers performed by Volvo or its agent. PacWest's Customer Service Index for 2018 through 2022 was above the goal of 8.0 as PacWest achieved 8.8, 8.8, 9.2, 8.7, and 8.4, respectively. (Ex. 325, Table 7.). Although Volvo pointed out problems with the survey process, including most importantly the generally low response rate, the surveys were conducted at the behest of Volvo which set the goal contained in the incentive plan. As such, we find that PacWest's satisfactory Customer Service Index to be adequate proof that it met the Customer Service KPM.

For Dealer Safety Performance, Beaton focused on PacWest's score for Safety Campaigns in the incentive programs. The Safety Campaigns score tracks dealer effectiveness in completing safety-related product replacements and modifications within a specified time frame. Beaton opined that PacWest satisfied the Safety Performance Metric because it met the 100% goal for safety campaigns in 2021 and 2022. Volvo's cross-examination suggested that Beaton should have additionally considered mandatory product updates that, in some sense, may have related to safety and as to which certain documents could be read as suggesting that PacWest performed less well on mandatory product updates than it did with respect to safety campaigns. We cannot rely on the product update data, however, because there was no satisfactory proof that

16

No. 01-22-0002-4846

such data actually relates to safety. Accordingly, we find that PacWest satisfied the Safety Performance metric.

Finally, for Staff Training and Readiness, Beaton examined PacWest's 100% Competence Development scores in the Iron Mark incentive program for 2020 through 2022. To satisfy Competence Development, the dealer had to have all employees enrolled in at least one competence development program. Volvo notes that there is no indication in the program that the employee must actually take and successfully complete the program. While those requirements are not expressly stated in the program document, we are cognizant that Competence Development is a Volvo requirement and Volvo is responsible for the description of the program, as well as that which constitutes successful completion. We therefore find that PacWest proved that it satisfied the Staff Training and Readiness metric through its 100% score in Volvo's Competence Development component of the Iron Mark program.

Based on all of the foregoing, we find that PacWest carried its burden of proving it satisfied the key performance metrics.

## II.    RULING AS TO LIABILITY.

As noted at the beginning of the discussion on page 2 above, we found in Order No 3 on summary judgment that Volvo had breached the terms of the Side letter in three specific ways. Nothing in the evidence received at the oral hearing inclines us to a contrary conclusion. In responding to PacWest's requests for approval of the three proposed transactions, Volvo did not pay any attention to the key performance metrics enumerated in the Side Letter. It did not perform any analysis of the metrics but instead took the position that the Side Letter was unenforceable as a matter of law and the metrics themselves incapable of being applied. As we

17

No.  01-22-0002-4846

determined then that the Side Letter was valid and enforceable, and have determined now that

the metrics understandable and capable of measurement primarily through Volvo's own data, we

confirm our ruling that Volvo breached its agreement with PacWest.

Because we find that Volvo breached the agreement, we need not determine whether

Volvo made "reasonable efforts to offer [PacWest] a first opportunity to acquire the additional

territory . . . ."  But because Volvo has offered evidence that its conduct in response to PacWest's

requests for approval was appropriate and reasonable, we address Volvo's argument.

Volvo contends that "the Panel should reverse its ruling that Volvo's reasons for

disapproving the proposals for all three [transactions] were not reasonable, articulated and non-

discriminatory" because "PacWest was well aware that double-digit market share was required

just to comply with its dealer agreement and that it was a chronic poor performer."  (Volvo Post-

Hrng. Br. at 19, citing Exs. 513 at pdf p. 13; 517[3] and Exs. 40-57 (monthly dealer performance

and red/green letters for 2021-22, showing GPE TOT Market share YTD ranging from 2.5% to a

one-time high of 9.2%).)  Volvo's CEO Stephen Roy testified that Volvo was not discriminatory

in that "every approved expansion required the expanding dealer to have double-digit market

share."  (Volvo Post-Hrng. Br., at 19.)  Volvo concluded that "Volvo was very reasonable and

had every right to not want a poor performer and difficult dealer[4] to expand.  (Roy, Tr. 3/14, pp.

---

[3]  In a letter from Mr. Wold of PacWest to Mr. McCammon of Volvo, PacWest showed its awareness of the importance of market share while offering tepid assurance of improvement if PacWest were to acquire Tri-State ("… Tri-State currently has an ~8 percent market share in CE (versus~ 10% for VCE in North America) … Both Tri-State and PacWest will be working to raise market share by a few points over the next 3-4 years."  (Ex. 517, p. 3.)

[4]  While the record makes clear that market share was Volvo's driving consideration, in its initial response to PacWest's proposal to acquire CMI, Mr. Sherwood advised that "PacWest has a history of its inability to achieve and maintain acceptable market share," but, contrary to PacWest's contention (PacWest Post-Hearing Brief at 2), Sherwood stated that PacWest "also has shown a disturbing history of uncooperativeness with VCE and has been dismissive in its dealings with VCE."  Ex. 68.  Mr. Sherwood went on to explain that Volvo had not mentioned PacWest's "uncooperative and dismissive nature toward

No. 01-22-0002-4846

12-14, 16-17, 18-20.)  As an example, allowing PacWest to acquire Tri-State would be like putting two D students together hoping they can make an A." (*Id*.)

Even if we accept that Volvo has always judged territory expansions based on the sole metric of market share and that Volvo believed that it did not make business sense to permit an under-performing dealer to have the exclusive right to sell Volvo's products in even more territory,[5] this evidence does not persuade us to alter the essential rulings in Order No. 3.  That is because Volvo ignores that it negotiated a bespoke dealer agreement with PacWest that specifically demoted market share from the primary metric to just one of five other metrics, four of which were new additions to the standard Volvo dealer agreement.  We cannot agree that Volvo should be found to have made reasonable efforts to offer PacWest a first opportunity to acquire additional territory when it disapproves a proposed transaction for a reason or reasons that are *inconsistent* with other provisions of the very contract that gives rise to the duty to act reasonably.  In contrast to its obligation to use reasonable efforts, Volvo based its refusal to approve the transactions based on a single metric, the primacy of which it had contracted away.  Had Volvo intended to preserve its standard practice of judging territory expansions by market share, then it should have ensured that the Side Letter actually said what it intended.

Moreover, as found in Order No. 3, Volvo did not approve the territory expansions because PacWest refused to sign Volvo's new dealer agreement.  Mr. Wakefield confirmed that

---

us" in letters sent to other dealers, but that PacWest should "please understand that this is also a reason that VCE cannot provide approvals." (*Id*.).  As we understand the evidence, the principal driver behind Volvo's charge that PacWest was uncooperative and dismissive was PacWest's refusal to sign the new dealer agreement that had been accepted by the great majority of Volvo dealers.  As noted, Volvo's refusal to recognize PacWest's right to a similar agreement is itself a breach of the Letter Agreement.

[5]   We make no finding on this point, just note Volvo's belief.  If that rationale were to be tested, one would have to take into account that JGC had the capital to make significant investments in any dealers it acquired through PacWest.  Such investments might call for a different conclusion as to the prospects of the newly acquired dealer.

No. 01-22-0002-4846

even if market share were ignored, he did not think Volvo would have approved the transactions if PacWest persisted in its refusal to sign the new dealer agreement. (Tr. 3/19, 130-31.) Here, too, Volvo cannot be said to have made reasonable efforts, since this reason for refusing approval was directly contrary to its obligation under the Side Letter that any new territory shall require a dealer agreement that is similar to PacWest's current Dealer Agreement.

Accordingly, the finding in Order No 3 that Volvo breached the contract when it disapproved of the pending transactions is confirmed. For the reasons stated above as well as the discussion below, we deny Volvo's request in Section VI of its post-hearing brief to reverse certain parts of Order No. 3.

On pages 12 to 13 of Order No. 3, we identified five provisions in Volvo's proposed dealer agreement that were materially less favorable to PacWest than the existing 2015 Dealer Agreement. In its post-hearing briefing, PacWest requests declaratory judgement stating that, in connection with any future territory expansion, those five provisions cannot be required in a new dealer agreement. (PacWest Resp. Br., pp. 18-19.) We decline to issue such declaratory judgment in the absence of having an entire agreement to consider. Any judgment on similarity of a proposed agreement to the 2015 Dealer Agreement necessarily would require consideration of the specific wording of all the terms of a proposed agreement. Any judgment as to a limited group of terms, taken out of the context of the entirety, necessarily would amount to speculation. Nevertheless, we reiterate the finding of Order No. 3 -- the five provisions identified on pages 12 to 13, which Volvo proposed in place of the original provisions, made the proposed agreement materially different from the 2015 Dealer Agreement.

No. 01-22-0002-4846

### III.    IS PACWEST ENTITLED TO DAMAGES?

#### A.    The Proposed Transactions and Volvo's Response.

PacWest asserts that Volvo's improper refusal to approve the transactions that Joshua Green Corporation ("JGC") negotiated with Tri-State, CMI, and Great West entitle PacWest to recover damages measured by PacWest's lost profits in the transactions. PacWest argues that it would have closed each transaction but for Volvo's refusal to approve them.

Volvo asserts in response that as to the proposed transactions with CMI and Great West, the proposed acquirer was Joshua Green Corporation, not PacWest, and JGC is not a party to, and has no rights, under the Side Letter. As to all three proposed deals, Volvo contends, in brief, that PacWest failed to prove that it could or would have closed with the selling dealers because (i) PacWest had not negotiated definitive, signed agreements with the sellers; (ii) PacWest never obtained written consent of other OEMs with which the sellers had agreements, including Volvo and Mack Trucks, or any other consents that were required; and (iii) various conditions precedent had not been satisfied and other matters relating to structure and ownership interests remained unresolved.

#### B.    Was JGC the Intended Purchaser of CMI and Great West?

The starting point for Volvo's argument is the proposition, with which we agree, that the only party entitled to claim benefits of the Side Letter is PacWest, not Joshua Green Corporation. The Side Letter is addressed to Andrew Wold, JGC Dealer Co LLC, which is defined in the "Re:" line as "JGC." The Side Letter and related 2015 Dealer Agreement are signed on behalf of JGC Dealer Co LLC. After the acquisition of ClydeWest in December, 2015, JGC Dealer Co LLC changed its name to PacWest. There has never been any doubt that PacWest, not JGC, as Joshua Green Corporation has been referred to throughout this arbitration, is the party in the Side Letter and Dealer Agreement.

21

No.  01-22-0002-4846

In the case of Tri-State, a signed letter of intent refers to PacWest as the purchaser.  (Ex. 59.)  Because the stated purchaser is PacWest, and the deal documents that were negotiated refer to PacWest as buyer, Volvo does not dispute that PacWest is the putative buyer in the Tri-State transaction.

In the case of CMI, an executed letter of intent shows Joshua Green Corporation as the contracting party.  (Ex. 304.)  In the case of Great West, an expression of interest signed by JGC refers to the interest of "Joshua Green Corporation and its affiliates" in acquiring Great West. (Ex. 366.)  Volvo argues that these documents show that JGC was the intended purchaser, not PacWest.  Volvo additionally cites to numerous documents that show that JGC analyzed and evaluated the proposed transactions and communicated with the selling dealers.   It further argues that PacWest, being a wholly-owned subsidiary of JGC, is not an "affiliate" of JGC and therefore does not fall within the scope of expression of interest that JGC issued to Great West.

Volvo's argument ignores the history of its relationship with PacWest.  JGC has $2 to 3 billion in investable assets.  (McCammon, Tr. 3/11, 113.)  Its relationship with Volvo began in 2015 when JGC initiated discussions about the purchase of a VCE dealer or dealers in the Pacific Northwest.  By way of introduction, JGC provided Volvo's management with Exhibit 106, which contains an explanation of JGC's business and its goals.  That presentation noted that JGC had a "long term interest is dealerships and distributors" and was looking to "build a regional dealer with sales of $200m+."  (Ex. 106, pp. 6-7.)  PacWest thus made it clear to Volvo that it was aiming to grow a dealer network in the northwest.  (Ex. 22.)  The "Dealer/Distributor segment" at JGC was led by Andrew Wold, who later became CEO of PacWest.

The discussion with Volvo in 2015 eventually centered on the possible acquisitions of ClydeWest.  Mr. McCammon testified that JGC does not operate any businesses directly.  For

No.  01-22-0002-4846

reasons of financial reporting, separation of liabilities, and ability to attract specific management, JGC always invests through separate operating entities.  (McCammon, Tr. 3/11, 137-38.)  Accordingly, a few days before closing of the ClydeWest transaction, JGC formed JGC Dealer Co, LLC and the name Joshua Green Corporation was stricken from the Side Letter and JGC Dealer Co, LLC inserted in its place.  (Ex. 21; McCammon, Tr. 3/11, 135-36.)  The Dealer Agreement similarly reflected that JGC Dealer Co, LLC was the dealer contracting with Volvo Construction Equipment.

Thus, Volvo understood from the beginning that JGC, PacWest's parent, drove the acquisition process and that it made investments through operating entities.  Moreover, McCammon testified that he told Ryan Sherwood directly that JGC would never structure any of the transactions in a way that would deprive it of the rights it had negotiated in the Side Letter.  (Tr.  3/11, 220.)  That JGC created numerous internal analyses and forecasts that show JGC as the investor in or acquirer of CMI and Great West, and JGC personnel negotiated directly with the dealers, does not dictate a different conclusion.  To the contrary, that evidence reflects that JGC Joshua Green Corporation was the muscle and driving force behind the proposed acquisitions; it does not establish that the JGC intended to close the transactions in its own name, thereby depriving itself and its wholly-owned subsidiary, PacWest, of the rights it secured under the Letter Agreement.

The record with regard to each proposed transaction confirms this conclusion.  As to CMI, the letter of intent signed by JGC reflects the broad terms of JGC's proposed equity investment in CMI but does not specifically address the entity through which that investment would be made.  (Ex. 304.)  That PacWest would be involved in the transaction is evident from an email that Steven Seward of CMI sent to JGC:  although CMI's management team would

No. 01-22-0002-4846

control operations in Alaska, "[w]e do expect, however, that there will be opportunities for CMI and PacWest (also owned by JGC) to work together to our mutual advantage." (Ex. 305.)  In fact, a JGC presentation provided to CMI expressly states that "PacWest Machinery (a majority-owned subsidiary of JGC) became the Volvo CE dealer for WA, OR and Northern ID."  (*Id.*, 2.) "Finally, in an exchange of draft amended LOI's between JGC and CMI, the proposed terms expressly state that "JGC, through an affiliated entity majority-owned and controlled by JGC, will acquire 100% of the units of CMI at an equity valuation of $38.3 million . . . ." (Ex. 373.)  It is amply clear from the communications between JGC and CMI that it was JGC's intention to acquire CMI through its affiliate, PacWest.

As to Great West, JGC's expression of interest is explicitly on behalf of JGC "and its affiliates." (Ex.366.)  PacWest contends that this language is clear indication that it would close the transaction through PacWest as opposed to JGC.  Volvo asserts in response that the term "affiliate" does not encompass subsidiaries of a parent entity.  The panel takes note that when speaking generally of affiliates in business and legal parlance, a subsidiary is considered an affiliate of its sister entities as well as its parent entity or entities.  An example of this is the reference in Exhibit 373 quoted immediately above in connection with proposed terms of the CMI transaction.  There the draft letter specifies the acquisition of CMI "through an affiliated entity majority-owned and controlled by JGC."  Moreover, the Great West LOI strongly suggests PacWest's involvement in the transaction because it notes PacWest's acquisition of ClydeWest in 2015 and states that "with the formation of PacWest, our goal has been to build a major dealership in Western North America . . . ." (Ex. 366.)  Accordingly, we find that JGC's expression of interest affirmatively contemplated that PacWest would be the acquirer of Great West.

24

No. 01-22-0002-4846

In summary, we have no difficulty concluding from the evidence that JGC intended to close the transactions in the name of PacWest and Volvo was well aware of this fact. Whether the selling dealers ultimately would agree to be acquired either by JGC or PacWest is a separate question addressed immediately below.

**C.    Would the Transactions Have Closed but for Volvo's Refusal to Approve them?**

Before considering each individual transaction, we address two generic arguments Volvo asserts: that the selling dealers never secured approval of their other OEMs so they could not close and that none of the transactions was ever reduced to definitive, signed agreements, with the result that PacWest cannot possibly prove that it would have acquired the selling dealers. We believe both arguments must be rejected because they ignore the fundamental reason why OEM approvals were not obtained and definitive documents not signed, namely that Volvo rejected the proposed transactions before they ever matured to the point where written OEM approvals would be needed or the full panoply of definitive agreements would be drafted and signed.

**Tri-State**: On January 8, 2020, PacWest sent Tri-State a letter summarizing the principal terms of a transaction by which PacWest would acquire Tri-State. (Ex. 59.) Negotiations lapsed because of the onset of the global pandemic. In November, 2021, a Contribution and Purchase Agreement was drafted to which the parties were in agreement. (Ex. 242; Zimmer dep., 200-01.) The deal was structured so that the agreements would be executed at the closing. Thomas Zimmer, president of Tri-State, testified that the PacWest opportunity was attractive to him. It allowed him to exit the business, take some money off the table, and invest in the new dealer. (*Id.*,183-84.) Moreover, the plan called for the retention of all employees. (*Id.*, 184-85.) Zimmer testified that he did not talk to any other potential acquirers. (*Id.*, 184.)

No. 01-22-0002-4846

Volvo notes that the agreement could not be considered final in that certain matters remained to be agreed or performed, e.g., numerous schedules called for by the agreement had not been created, specifics of Zimmer's continuing ownership had not been agreed, and the consent of OEMs as well as Zimmer's wife had not been obtained. It is true that all the documents were not in place. But the evidence shows that Zimmer wanted and intended to proceed with the deal. (*Id.*, p. 185.)

Zimmer testified that he did not want the transaction with PacWest to be disclosed prematurely to Tri-State employees. (*Id.*, 44-45.) His plan was to seek approval of Volvo Construction Equipment and Mack and Volvo Trucks before approaching any other OEMs of manufacturers. (*Id.*, p. 68.) Zimmer gave notice to Matt Davidson of Volvo and Mack Trucks in December 2021, although he did not provide them with executed copies of any agreements. (*Id.*, 111-12.) Davidson did not request any information from Zimmer and never indicated a problem with the proposed transaction. (*Id.*, 210-11, 241.) Zimmer testified that, given consolidation in the industry, the necessity for scale, and the prospect that fresh money was coming in, he assumed he would obtain all required OEM consents. (*Id.*, 206-07.) Additionally, Zimmer testified that in connection with a transfer of interest in 2006, he had not experienced any problem with OEM consents. (*Id.*, 205.)

The evidence does not disclose any significant impediment to closing the deal with Tri-State. We note that David Winner, who oversees the Volvo and Mack Trucks networks, testified to numerous reasons why the Volvo truck companies, which comprise a large part of Tri-State's business, would never have approved Tri-State's sale to PacWest, such as lack of a completed application, absence of signed documents, the put-call agreement relating to Zimmer's interest in the new dealer, etc. Although we do not doubt that Wimmer accurately testified to the formal

26

No.  01-22-0002-4846

process that the truck companies would follow, that process was obviated here by the refusal of Volvo Construction Equipment to approve the transaction in the first instance.  The truck companies were never called on to consider a transaction that their sister company approved and therefore wanted to see consummated.  We strongly doubt that the truck companies would have presented any problem if VCE had approved.[6]  In any event, Volvo is not in position now to benefit from the postulated refusal of its affiliated truck companies when Volvo itself prevented their having to pass on the transaction.

The evidence thus convinces us that PacWest carried its burden of proving it was more likely than not that PacWest would have closed the deal with Tri-State along the lines that had been negotiated as of the date of Volvo's letter informing told PacWest it would not approve the transfer.  (Ex. 68.)

**CMI:**  On April 28, 2002, CMI and JGC executed a non-binding letter of intent calling for the acquisition of CMI over two years.  Ken Gerondale, who owned 77% of CMI and exercised 100% control, raised the possibility of selling the dealership to Stanley McCammon in March 2022.  (Gerondale dep., 11, 17-19.)   Although Gerondale had good chemistry with the JGC team, he did not want PacWest and CMI under the same management team.  (*Id.*, 22-23.)  A lawyer for CMI sent an undated term sheet that specified that "CMI would remain an independent subsidiary of JGC and would be managed separately from PacWest."  (Ex. 303, ¶ 5.a.)  Gerondale testified that he was prepared to deal through a JGC affiliate as long as he could maintain the management structure they had discussed.  (*Id.*, 43.)  Ultimately, Gerondale agreed to have PacWest as owner of the new dealer as long as he had operational autonomy.  (*Id.*, 47.)

---

[6]  To the extent Mr. Wimmer's testimony is to the contrary, we do not credit it.

No. 01-22-0002-4846

On September 11, 2022, JGC drafted a letter stating the principal terms of a revised transaction. It specified that JCG, through an affiliated entity, would acquire 100% of CMI in a single closing at an agreed equity valuation. (Ex. 66.) Subsequent edits to the letter by CMI clarified that Gerondale and his management team would have "complete control of CMI's operations." (Ex. 344, ¶ 1(d).) Gerondale testified that if Volvo had not refused to approve the deal "there's no doubt that we would have completed the transaction." (Gerondale dep., 50.) Gerondale felt that JGC would do what it takes to make him happy in the transaction. (*Id.*, 44.) In fact, he announced the deal to his senior management. (*Id.*, p. 50.) In addition, Gerondale communicated to his OEMs, none of whom expressed any objections. (*Id.*, 51.) Gerondale testified that it would be against their interests not to agree given his age. (*Id.*, 84-85.) He testified that CMI would have obtained OEM consents after the parties had signed the agreements. (*Id.*, 51.)

We find that PacWest met its burden of proving that it was more likely than not that it would have closed with CMI but for Volvo's refusal to approve the transaction.

**Great West:** Mr. McCammon encountered Colin Matejka, who owned 35% of Great West, at a dealer conference in March, 2022 and raised the possibility of acquiring his dealership. (Tr. 3/11, 237-38.) Ross Davidson, who was president of Great West, also owned 35% of the dealership; the remaining equity was distributed among the management team. On April 6, Davidson discussed with McCammon the interests of the shareholders in a potential deal: Davidson wanted to sell his interest but retain 10%; several shareholders wanted to continue working and also co-invest; and Davidson was interested in selling dealership real estate as part of the transaction. He told McCammon that he thought the value of the business was $60 million Canadian. (*Id.*, 240-43.)

28

No. 01-22-0002-4846

On September 8, 2022, McCammon sent a signed Expression of Interest to Great West on behalf of JGC and affiliates. (Ex. 366.) The letter specified consideration of $48 million Canadian for 80% of the equity with the remainder retained by management. For 100% of the equity, the consideration would be $54 million. JGC also was willing to consider buying the real estate at appraised valuations. Subsequently, Davidson asked McCammon to allow Great West to use the original exchange rate even though the rate had moved against the Canadian dollar. McCammon agreed, with the result that JGC gave up approximately $3 million in exchange rate differential. (Tr. 3/11, 265-66.) On November 4, 2022, Davidson and Matejka spoke with Roy and Wakefield to pitch the transaction. Volvo told Great West it would not approve. (Ex. 397.)

Great West was also being courted by NORS. Davidson clearly favored the JGC proposal; he viewed its offer as stronger than NORS' because of JGC's willingness to discuss purchasing the real estate and allowing management to co-invest. (Davidson Dep., p.45.)

McCammon believed that Davidson was speaking on behalf of all shareholders. (Tr. 3/12, 407-08.) The evidence shows, however, that Colin Matejka viewed the transaction differently. He thought that NORS offered better synergies with the customers and testified that NORS had the better price for 100% of the equity. (Matejka Dep., 89-91.) But Matejka's chief concern was that he did not think he could work for Andy Wold. (*Id.*, 55-56, 107.) Matejka testified that he "made it very clear with [McCammon] it's JGC that's buying us, not PacWest." (*Id.*, 55-56.) Matejka was unyielding on this. He testified repeatedly that the offer was from JGC and it was JGC that would be buying Great West. (*Id.*, 55, 105-08, 128.) There was no discussion of PacWest owning Great West but with Matejka and Davidson having operational control:

> Q. …. And you had Mr. McCammon's assurance that he was
> going to give you -- you know, if -- if you went ahead with this

29

No. 01-22-0002-4846

> transaction, you were going to continue to have operational autonomy, correct?
>
> A. I don't recall those words and that conversation. I recall that we would not be part of PacWest, that we'd be owned by Joshua Green.

(*Id.*, 108.)   He further testified that he expected to report to someone at JGC, not PacWest.  (*Id.*, 134-35.)

If JGC had insisted that PacWest had to be the owner, Matejka allowed that there would be a discussion.  He was only one vote, so he could not say that Great West would never agree to an acquisition by PacWest.  (*Id.*, 56.)  As to the contest between JGC and NORS, Matejka testified that if Volvo had not said "no," it was a 50/50 proposition, a horse race as to who would win.  (*Id.*, 130-31.)

Unlike the cases of Tri-State and CMI, we are not persuaded that PacWest carried its burden with respect to Great West.  The evidence shows that a 35% owner did not want to work for Wold of PacWest and did not want Great West to be acquired by PacWest.  It is possible that JGC could have found a way to change Matejka's mind, but that clearly is speculation.  There is no evidence in the record that Matejka's concerns were being addressed or would be resolved.

Coupled with this is the fact that Davidson and Matejka appeared to have differing perceptions on the strength of JGC's bid as compared to that of NORS.  The evidence shows that Davidson favored JGC's offer but Matejka said it was 50/50 between the two.  On these facts, we must conclude that PacWest has not shown that it was more likely than not that PacWest would end up acquiring Great West.

30

No.  01-22-0002-4846

IV.    **WHAT ARE PACWEST'S DAMAGES?**

In its presentation on damages, PacWest relied upon the expert testimony of Neil Beaton. As explained in further detail below, Mr. Beaton used a projected "starting point" for year one of projected net income loss for each of the intended acquisitions.  The starting point for CMI was the average historical net income over the prior ten years for that distributor.  (Ex. 782, Updated Sch. 4.)  For Tri-State, Beaton relied on PacWest's projection of net income and income growth for Tri-State up through 2027 (Ex. 517) and then applied a 3% annual growth year-over-year, representing 2% annual inflation and 1% actual growth.  He relied, in part, on the IBIS World survey as one data point which looked at various industries and found just dollar growth of this industry to be about one percent for the next five years.  (Tr. 3/14. 254-55.)  Historically, the survey noted growth had been much greater than one percent.

Noting the significant increase in the inflation rate in recent years, Mr. Beaton's analysis looked at long-term growth over period of 20 years. He noted that historically inflation runs between about 2.75 and 3.75 long term and real GDP is about one to two percent. *Id.* As a result, the business "can't grow faster than one to two percent and you can't not raise your prices or you're going to get hammered by inflation. So, you have to have a minimal amount of growth, one percent real growth, two percent inflation that makes up my 3 percent. (Tr. 3/14, 255.) According to Beaton, his projected 1% real growth year over year is supported by average historical GDP greater than that amount (long term and real GDP is about one to two percent, id.), the IBIS World report (Tr. 3/14,  254), and historical averages of the growth rate of the intended acquisitions (actual annual growth averaged 8.9%.for CMI. (Tr. 3/14,  285:7-10).)  This modest real growth is reasonable in the context of PacWest's and  Beaton's use of a 15%

31

No.  01-22-0002-4846

discount rate.  (Tr. 3/14, 230: "…15 percent is a typical hurdle rate for large corporations, but it's neither aggressive nor is it conservative, it's kind of in the middle.")

The panel considered the testimony and analysis of Volvo's expert, Tiffany Lewis, that there would be little to no actual growth over the 20-year investment period not to be persuasive. Ms. Lewis opined that PacWest's increase in profits (net income) would be subsumed by increase in expenses.  However, this indicates that a substantial investment with a significant risk allocated a 15% discount rate would generate little if any profit over a 20-year investment period. Mr. Beaton's counterargument that such a low rate of return would be expected for a lower risk investment, such as corporate bonds, and would be reflected in a much lower discount rate. Accordingly, Mr. Beaton's analysis on the growth rate is more convincing on this issue.

### CMI DAMAGES

For CMI, Beaton calculates damages to PacWest for the actual amounts reported by CMI as income for 2022 and 2023:  $9,171,488 and $15,950,511, respectively.  (Ex. 782, Updated Sch. 4.)  Notably, for 2024, Beaton used the projected lost income amount as $6,662,570: the 10-year historical average for CMI of $6,341,704, plus 3% growth.  (*Id.*)  Beaton also looked at CMI's historical profit over the 10-year period that ended in 2022 and determined that actual annual growth averaged 8.9%.  (Tr. 3/14, 285:7-10; see also Tr. 3/15, 170:17-21 (acquisition target forecasts "were much higher than three percent").)  This corroborates that three percent annual growth is a reasonable calculus to project PacWest's loss.  For each subsequent year, until 2042, Beaton applied the 3% year-over-year analysis, with a 2042 terminal value of $73,414,753. (Ex. 782, Amended Schedule 1.)  The total calculated actual and projected net income loss to PacWest as a result of being unable to close on the CMI deal is a net present value of $18,918,100, applying a 15% discount rate.  Considering the methodology employed and the

32

No. 01-22-0002-4846

data utilized, we find this estimate of damages to be reasonable. However, this loss of net income loss must be adjusted, as discussed below, to reflect PacWest's duty to mitigate.

## TRI-STATE DAMAGES

PacWest's expert calculated PacWest's economic damages related to its attempted Tri-State acquisition by forecasting the cash flow PacWest expected to generate from the acquisition starting on February 1, 2022, the estimated date of closing. (Tr. 3/15, 4.) PacWest prepared a forecast of Tri-State's anticipated revenue, gross margin and annual profit from 2022 through 2027. In an internal memorandum dated February 6, 2020, PacWest projected net income and income growth for Tri-State up through 2027. (Ex. 517.) These data and projections were used by PacWest in evaluating the price at which it wanted to purchase Tri-State. (Ex. 517.) These are the figures that Mr. Beaton used in calculating projections over the 20-year investment period and projected net income loss. (Tr., 3/15, 2-6.) Although these projections included the expectation that post-acquisition PacWest would additionally obtain another dealership in Missoula or Yakima, not acquiring those additional dealerships would not significantly alter the projected net income and growth numbers. This is because there would be significant costs associated with the additional acquisitions of either Yakima or Missoula, which would offset additional projected net income from those other dealerships. (*Id*. , 9-10.) For Tri-State in particular, which was characterized by Mr. Beaton as undercapitalized, the increased infusion of PacWest capital was anticipated to drive sales up with the concomitant expansion of operations, ultimately resulting in an increased profit margin. (Tr. 3/14, 182-183.)

The proposed purchase price for Tri-State was $10,304,284. Beaton used the PacWest projected net income calculations for 2022–2027, and then utilized the 3% annual year-over-year growth rate that he had applied similarly for CMI (and to Great West.) The starting point for

33

No.  01-22-0002-4846

Year 1 was PacWest's projection of Tri-State's income, rather than the historical average.  The actual historical average for Tri-State used by Volvo's expert, Tiffany Lewis, was actually higher than the starting point projected by PacWest and employed by Beaton:

> You can see this covers 2004 through 2019, and so you see those cash flows kind of going up and down over that period. It's a long period to look at. They're averaging about $960,000 per year.

(Tr. 3/19, 172-173.)  Beaton used a starting point, $ 750,000, lower than Lewis' average historical average of $960,000 a year.  (Ex. 782.)  However, for the following five years, he applied PacWest's projections, rather than a 3% growth rate.  *Id.*  Following those five years of projections, he then applied a 3 % annual year over year growth rate.  (Ex. 782, Updated Sch. 4.)

With a projected terminal value of $28,739,205, the total calculated projected net income loss to PacWest as a result of being unable to close on the Tri-State deal is a net present value of $4,264,900, applying a 15% discount rate.  (*Id*.)  Considering the methodology employed and the data utilized, we find this estimate of damages to be reasonable.  As with the case of CMI, this loss of net income loss must be adjusted to reflect PacWest's duty to mitigate.

### DID PAC WEST HAVE A DUTY TO MITIGATE ITS DAMAGES?

Under Pennsylvania law, a party has a duty to mitigate losses. *Bafile v. Borough of Muncy*, 588 A.2d 462, 464 (Pa. 1991).  Pennsylvania law does not allow PacWest to use a "theory of lost volume" approach as Beaton did.  As the Pennsylvania Supreme Court held in *Northeastern Vending Co. v. P.D.O., Inc.:*

> the theory of 'lost volume' erodes the duty to mitigate. Application of the doctrine would encourage the non-breaching party to do nothing to minimize its damages.  Moreover, if compensation for 'lost volume' was permitted, the non-breaching party would recover lost profits from the breached contract and the profits it would have made had it contracted with someone else. This directly conflicts with the purpose behind awarding contract damages.

No. 01-22-0002-4846

*Northeastern Vending*, 606 A.2d 936, 938 (Pa. 1992) (citations omitted).

Mr. Beaton acknowledged that Pennsylvania law requires a plaintiff to mitigate and disallows the lost volume seller theory. (Tr. 3/15, 166-168.) However, Mr. Beaton admitted that his calculation omitted any part of any mitigation analysis (Tr. 3/14, 270-271, 274-277), even though he did include such analysis in his delay damages calculation on all three proposed acquisitions:

> Now, I have this cash waiting because the panel says you can now buy Tri-State, I need that cash around. I'm going to be earning some interest on that and I spoke with Mr. McCammon and during the time that they were waiting for this, they were putting them into treasuries earning anywhere from early on, right, about 1 percent, they're now making 3 or 4 percent so the return on the parked cash that's being held for the delay with the hopes of the acquisition, is earning interest, I deduct that, that's why that's in red. I come up with the damages on monthly basis.

(Tr. 3/14, 224-225.)

However, for his "no acquisition" analysis, Mr. Beaton did not calculate any similar reduction in damages. In its post-hearing brief, PacWest asserted that "Beaton's 15% discount rate already accounts for mitigation of damages." PacWest Post-Hearing Br., p. 13 (citing *Dougherty v. School Dist. of Pa.*, 2015 WL 2365600 at *8 (E.D. Pa. May 18, 2015).) *Dougherty* involves a completely different set of facts where plaintiff actually went out and mitigated his damages. The discount rate was used by plaintiff's expert to reduce his future lost earnings (front pay) to present value. The question of alternative investments, as a form of mitigation argued by Volvo and its expert Lewis, was not at issue in *Dougherty* because plaintiff had in fact mitigated his damages by finding alternative employment. Rather, the plaintiff's expert appears to have reduced plaintiff's damages by his income from alternative successor employment along with discounting plaintiff's future wage loss with an appropriate discount rate. *Dougherty*, 2015 WL 2365600, at *9, fn 1 ("Additionally, Verzilli explained his assumptions and methodology,

35

No.  01-22-0002-4846

indicating he accounted for Dougherty's mitigation through his new position with the City of Allentown, future wage growth, and an appropriate discount rate; he also provided estimates for various durations of front pay periods.")

PacWest's position on a duty to mitigate is not supported by its expert's opinions and testimony and is contrary to Pennsylvania law.  For purposes of her analysis on mitigation, Volvo's expert Lewis used the same dates, purchase prices, growth and cash flow used by Beaton.  She then adopted a 3.5%, 20-year Treasury bond investment rate as an alternative investment for purposes of mitigation.  To consider this in another fashion, if PacWest retains the investment funds that it would have used for acquisition of these additional dealerships, it can invest those funds in a similar-type investment or a more conservative investment, such as T-bills, awaiting a similar-type investment.  The panel agrees that these dealership acquisitions are a unique form of investment for PacWest, given its initial investment in acquiring Clyde West and its intended long-term expansion plans.  Accordingly, a similar type of investment may not be readily available for PacWest.  (Tr.  3/14, 277-279.)  Nonetheless, PacWest retains the investment funds, which have some value, even at the minimum rate of return of treasury bills. To fully compensate PacWest for its lost opportunity damages and also afford it the opportunity for a conservative, low-risk, low rate of return investment would potentially give PacWest a double recovery and excuse its duty to mitigate its damages. Accordingly, the panel finds that PacWest's damages should be reduced to reflect its ability to invest in a conservative, low-risk, low rate of return investment.  Lewis has conducted that calculation for the failed acquisitions of Tri-State and CMI as follows:

36

No. 01-22-0002-4846

| | |
|---|---|
| TRI-STATE | $ 2,895,133 |
| CMI | $11,534,630 |
| | $14,429,763 |

(Ex. 785, Workpaper 3.1a.; Tr. 3/19, 202-03.)

The panel concludes that PacWest's damages, after consideration of reduction for its ability to mitigate its damages, are $2,895,133 for Tri-State and $11,534,630 for CMI, for a total of $14,429,763.

## V.    IS PACWEST ETITLED TO DISTRIBUTE E-MOB MACHINES UNDER ITS CURRENT DEALER AGREEMENT?

The parties dispute whether PacWest is entitled to distribution of electric mobility vehicles (e-Mob) pursuant to the terms of its Dealer Agreement with Volvo. That Agreement grants PacWest the exclusive right to sell Volvo Machines (GPE, COE, and Road) in the Pacific Northwest territory. Addendum I of the Dealer Agreement defines Volvo Machines as:

> New, unused construction equipment as designated by Volvo from time to time and which Dealer is authorized to sell as specified on the Territory and Products Addendum, Addendum IX (the parties agree that the correct reference should be VIII).

However, specifically exempted from this grant is the following:

> Provided, however, that all other equipment manufactured and/or distributed by Volvo or an Affiliate (including but not limited to successor designs, categories and models of such equipment) and not listed on Addendum [VIII] shall be excluded from the definition of Volvo Machines.

Addendum VIII to the 2015 Agreement presents in tabular form in Exhibits A through C, by county and product, PacWest's appointment as the exclusive authorized dealer of Volvo Products in each territory. (2015 Agreement ¶ 2.1.) The "products" listed in Exhibits A-C of Addendum VIII for which PacWest was appointed as exclusive dealer are as follows: GPE

37

No.  01-22-0002-4846

(General Production Equipment (large machines)), COE (compact machines), RMCOMPAL, RMCOMPAS, RMCOMPSL, RMCOMPSS and RMHWY (the latter, road machines).  None of the product listings specify the power source of the equipment included, whether internal combustion or electric.

One of the pivotal issues to be resolved is whether the exclusion for all other equipment "including but not limited to successor designs, categories and models" refers to the products listed in Addendum [VIII] (including GPE, COE and Road) or does it refer to "successor designs, categories and models" of all other equipment manufactured and/or distributed by Volvo, not listed on Addendum [VIII].  Under the first interpretation, as proposed by Volvo, PacWest would not be entitled to distribute any of the successor designs, categories or models of the current equipment designated on Addendum VIII.  Under PacWest's interpretation, only the successor designs, categories and models of equipment not listed on Addendum VIII would be carved out from PacWest's distribution rights.

Volvo argues that the exclusion for successor designs, categories or models must apply to the current equipment which PacWest is entitled to distribute.  It asserts that because all other equipment manufactured and/or distributed by Volvo, not listed on Addendum VIII is already excluded from the definition of products that PacWest is entitled to sell, the additional language would be superfluous. We must "not interpret one provision of a contract in a manner which results in another portion being annulled." *Wiley v. Brooks*, 263 A.3d 671, 676 (Pa.Super., 2021) (citing *LJL Transp. v. Pilot Air Freight*, 599 Pa. 546, 962 A.2d 639, 648 (2009)).  Thus, an interpretation of the contract will be rejected if it leaves portions of the contract language meaningless or superfluous.  *MBC Development, LP v. Mille*r, 316 A.3d 51, 69 (Pa., 2024).  As a result, the exclusion for successor designs, categories or models of all other equipment

38

No.  01-22-0002-4846

manufactured and/or distributed by Volvo, not listed on Addendum [VIII], is superfluous if all other equipment manufactured and/or distributed by Volvo, not listed on Addendum [VIII] is already excluded.

To the contrary, PacWest asserts that because models and designs of machinery may change from one year to the next, it makes little commercial sense to change the designation of products and territories to which a dealer is appointed with every such change. Therefore, PacWest further argues that "successor designs, categories and models of all such equipment" refers to and is limited only to equipment "not listed on Addendum [VIII]" ("Before a court will interpret a provision in a ... contract in such a way as to lead to an absurdity or make the ... contract ineffective to accomplish its purpose, it will endeavor to find an interpretation which will effect the reasonable result intended."). *Starling v. Lake Meade Property Owners Association, Inc*., 162 A.3d 327, 345, 640 Pa. 126, 155 (2017); *See Pocono Manor Ass'n v. Allen*, 337 Pa. 442, 12 A.2d 32, 35 (1940).

At the time of the parties' cross-motions for summary judgment, the panel found on the summary judgment record that it was not clear whether products performing the same functions as previously existing products but differently powered were intended to be excluded from the definition of "Volvo Machines" in Addendum I.  We found that the definition of "Volvo Machines" in Addendum I to the 2015 Dealer Agreement is ambiguous and not susceptible to summary resolution.

The evidence presented at the hearing supports PacWest's Interpretation as more reasonable.  First, as previously asserted by PacWest, both Jolene Logue and Volvo's own expert employee, Dr. Ray Gallant, established that Volvo often changed both its models and designs for the equipment that was being sold by PacWest and its other distributors.  In fact,

No. 01-22-0002-4846

Volvo redesigned its equipment so frequently that it is in the process of abandoning its prior practice of designating a new series of design and is identifying newer, redesigned equipment only by the year. (Tr. 3/18, 147-48, 167.) So, for example, for the excavator crawler, currently designated as EC480E, the "E" reference representing five different designs, with a sixth design that would be designated as "F," although Volvo may drop that designation in favor of simply identifying the year of manufacture. (*Id.*, 167.) Accordingly, if Volvo's interpretation were to be applied, PacWest would lose its exclusive right to distribute not only the excavator crawler once Volvo created a successor design for this product, but it would lose such rights for any and all products for which there were a "successor design." As a consequence, Volvo's interpretation would result in a ... contract in such a way as to lead to an absurdity or make the ... contract ineffective to accomplish its purpose…"

Additionally, the undisputed facts were that throughout the course of the dealership agreement between PacWest and Volvo, Volvo distributed successor designs of the products listed in Addendum [VIII] (including GPE, COE and Road) to PacWest for sale. As noted on page 8 above, "[C]ourse of performance is always relevant in interpreting a writing," regardless of whether the terms are clear or ambiguous, and may be the "strongest indication" of the intention of the contracting parties. *Atl. Richfield Co. v. Razumic*, 390 A.2d 736, 741 & n.6 (Pa. 1978), and a court should consider the course of performance no matter whether the language of the contract is ambiguous or unambiguous." *AstenJohnson v. Columbia Cas. Co.*, 483 F. Supp. 2d 425, 467–68 (E.D. Pa. 2007), aff'd in part, rev'd in part sub nom. *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213 (3d Cir. 2009). Thus, based on both contract interpretation to avoid an absurd result and course of performance, we conclude that the term "successor designs, categories and models of all such equipment" refers to and is limited only to equipment "not

No. 01-22-0002-4846

listed on Addendum [VIII]" and not those products that PacWest was contractually and legally entitled to sell.

Nonetheless, even if electric mobility equipment is not a successor design, category or model to "new, unused construction equipment … listed in Addendum VIII," does it fall within the equipment listed in Addendum VIII, including GPE, COE and Road, or does it constitute products "not listed on Addendum [VIII]"? Dr. Gallant testified that the specifications, functions, usage, and categorization ((GPE/COE/Road) between diesel and e-Mob were either identical or very similar.

Specifications: "Volvo electric and diesel machine specs are nearly identical…." (Tr. 3/18, 121.)

Design: "design, we designed it (electric excavator and L25 Electric wheel loader) to be the same, as close as possible to the diesel counterpart so the operators would feel comfortable and the operation of it would be predictable to the operator. *Id.*

Categorization:

> Q. And even with the electric versions of machines, they're still organized by that late class principle, correct? So, the EMO excavator, it's still COE. The EMO 23-ton excavator is still GPE, correct?
>
> A . Yeah, so an eMob machine will fall into one of those categories [GPE, COE] based on what it does, the job it does."

(Gallant, Tr. 3/18, 150; *see also* Ex. 756, 1.)

Usage: "[W]hen it comes to power and performance, our ECR25 Electric excavator and L25 Electric wheel loader specifications are nearly identical to their diesel counterparts." (Tr. 3/19, 121.) The electric machines are "doing the same work that [the operators are] used to, that they have always relied on their Volvo excavators to perform." (Tr. 3/18, 125.)

41

No. 01-22-0002-4846

Volvo maintains that the E-mobility machines were not marketed anywhere in the United States when PacWest executed the 2015 Dealer Agreement and, therefore, it "is impossible for them to have been included as a Volvo Machine in December 2015." (Volvo Post-Hearing Brief, at 29.) "Only the equipment that Volvo manufactured when PacWest signed its Dealer Agreement which did not include sustainability products, are included in the definition of 'Volvo Machine.'" (*Id.*) However, both Logue and Gallant testified as to Volvo's distribution of non-electric newly designed and new technological equipment to PacWest, such as articulated haulers, EMO excavator, and development of semi-autonomous and autonomous equipment – none of which have been manufactured at the time when PacWest signed its Dealer Agreement. (Gallant, Tr. 3/18, 171-172 ("It's still a GPE machine, totally different technology.")

PacWest has the exclusive and unqualified right to sell "Volvo Products" in the Pacific Northwest territory. The definition of Volvo Products consists of three Volvo Machine Categories: GPE, COE, and Road. Just as with the articulated haulers, semi-autonomous and autonomous products, electric mobility equipment presents new designs and new technology. However, the undisputed evidence is that "an emob machine will fall into one of those categories [GPE, COE] based on what it does, the job it does." (*Id*. 121, 150; Ex. 756.) Accordingly, the panel finds that PacWest is entitled to distribution of electric mobility vehicles (e- Mob) pursuant to the terms of its Dealer Agreement with Volvo.

## VI.    SUMMARY OF RULINGS.

This is a final partial award. It is based on the rulings made in Order No. 3, the evidence received at the March, 2024, oral hearing, and the decisions made in this award. Our rulings are summarized as follows:

1. The Side Letter is a valid and enforceable agreement between Volvo and PacWest.

42

No. 01-22-0002-4846

2. PacWest satisfied a majority of the Key Performance Metrics identified in the Side Letter.

3. Volvo breached its obligations under its Side Letter with PacWest in that it (i) failed to make reasonable efforts to offer PacWest a first opportunity to acquire additional territories; and (ii) failed to offer a dealer agreement for the additional territories that was similar to the existing 2015 Dealer Agreement.

4. PacWest is entitled to damages from Volvo with regard to the Tri-State and CMI transactions that Volvo refused to approve.

5. Those damages are $2,895,133 in respect of Tri-State and $11,534,630 in respect of CMI, for a total of $14,429,763.

6. PacWest is entitled to distribute e-MOB machines under its existing 2015 Dealer Agreement with Volvo.

7. We decline to issue any declaratory judgments.

The matters identified in Section VII below are reserved for resolution in the final award.

## VII.  PREJUDGMENT INTEREST, ATTORNEYS' FEES AND COSTS, AND ARBITRATION COSTS.

(1)  PacWest seeks pre-judgment interest on any award that is issued.  However, the parties have not had, however, a full opportunity to address the propriety of pre-judgment interest.  We therefore order that the parties brief the issue pursuant to the schedule set below.  Such briefing should address the legal basis for awarding interest, including whether the obligation owed by Volvo, now reflected in our award of damages, can be characterized as liquidated or not, and if not liquidated or easily ascertainable, on what basis would prejudgment interest be recoverable?

43

No. 01-22-0002-4846

(2)   In Section VI of Order No. 3, we held that PacWest was entitled to recover the attorneys' fees and costs it incurred in the litigation Volvo commenced in United States District Court for the Middle District of Pennsylvania. We deferred determination of the amount recoverable until after our resolution of the merits of the parties' dispute.

(3)   The arbitration agreement that governs this proceeding provides that our "award shall give the prevailing party its arbitration costs." (2015 Dealer Agreement, Addendum VII, § 12.). Given our rulings in this partial final award, PacWest is the prevailing party. We note that Section 12 does not specifically refer to attorneys' fees and costs.

PacWest shall within forty-five days of the date of this Partial Final Award submit its claims for the matters referred to in the three paragraphs above; Volvo shall submit its opposition within thirty days thereafter; and PacWest may reply within fifteen days.

This Partial Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are denied.

This Partial Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

No.  01-22-0002-4846

September 25, 2024


*Gerry Saltarelli*

_____
Gerald G. Saltarelli, Chair

 

                                  _____
                                  William H. Knull, III
                                  Except as set forth in the partial
                                  dissent below.


_____
Hon. John P. Erlick (Ret.)

45

No. 01-22-0002-4846

September 25, 2024

*Gerry Saltarelli*

_____
Gerald G. Saltarelli, Chair

_____
William H. Knull, III
Except as set forth in the partial
dissent below.

*John C. Erlick*

_____
Hon. John P. Erlick (Ret.)

45

No. 01-22-0002-4846

September 25, 2024

*Gerry Saltarell*

_____
Gerald G. Saltarelli, Chair

*William H. Knull, III*

William H. Knull, III
Except as set forth in the partial
dissent below.

_____
Hon. John P. Erlick (Ret.)

45

No. 01-22-0002-4846

**Dissenting Opinion of William H. Knull, III**

I must reluctantly reiterate my dissent from the decision of my distinguished colleagues insofar as they conclude that Volvo breached its agreement with PacWest and that that breach caused damage that warrants the imposition of substantial monetary compensation. In particular, I dissent from the majority's holdings that

> 3.     Volvo breached its obligations under its Side Letter with PacWest in that it (i) failed to make reasonable efforts to offer PacWest a first opportunity to acquire additional territories; and (ii) failed to offer a dealer agreement for the additional territories that was similar to the existing 2015 Dealer Agreement.
>
> 4.     PacWest is entitled to damages from Volvo with regard to the Tri-State and CMI transactions that Volvo refused to approve.
>
> 5.     Those damages are $2,895,133 in respect of Tri-State and $11,534,630 in respect of CMI, for a total of $14,429,763.

My dissent from the majority's decision on cross-motions for summary judgment in Order No. 3 rested on the need for a full record to determine the reasonableness of Volvo's refusal to approve PacWest's request for expansion to new territories under all the circumstances. Despite the limited summary judgment record, the majority concluded that PacWest had carried its burden of proof on reasonableness, presumably as a matter of law, based on what they saw as undisputed facts available in the record at that time, namely, that Volvo had acted based solely on the failure of PacWest to achieve a minimum share of its market in its exclusive territory. After extensive briefing and a seven-day evidentiary hearing, the majority stands by its original holding albeit on a somewhat attenuated rationale.

The fact that Volvo relied principally although, as the majority now concedes, not entirely, on PacWest's deficient market share in refusing to extend its exclusive territory was largely undisputed. However, it is far from clear that PacWest carried its burden of proving that Volvo's

No. 01-22-0002-4846

reliance on the dealer's performance was not reasonable, where PacWest consistently failed to sell enough Volvo machines and products to arise even to the level of the average dealer in Volvo's national network over the seven-year history of its exclusive dealership.

Volvo's defense started from the proposition, which I believe to be correct, that it is absolutely free to decide with whom it will do business, particularly where doing business means granting the other party the exclusive right to sell Volvo's expensive capital equipment in a large geographical area. It is not disputed that from the outset of the relationship PacWest had no absolute right to expand its territory:

> "*[e]xcept as set forth in the side letter* dated December 8, 2015, [PacWest] does not obtain by virtue of this Agreement any right to acquire additional dealerships, or any other Territory, for Volvo Products or other Volvo machines …"

(2015 Dealer Agreement, Ex. 28, § 3.5 (emphasis added).) As a necessary result, Volvo's freedom to decide whether to grant additional exclusive territory to PacWest exists unless PacWest proves that that freedom is constrained by clear contractual language in the Side Letter.

No such language appears in the Side Letter, and the majority cites to none.

The Side Letter does say that if PacWest meets a majority of agreed Key Performance Metrics ("KPMs") Volvo must make "reasonable efforts to offer [PacWest] a first opportunity to acquire the additional territory …" But nothing in the Side Letter defines what efforts are reasonable and nothing says that reasonable efforts must be determined based on the checklist of metrics found in section 6.2 of the Dealer Agreement or what relative weight must be given to any of those metrics.

In Order No. 3, the majority found that in "light of the purpose of the Side-Letter" to define PacWest's expansion rights and "Volvo's interest in effective distribution of its products,"

> the phrase reasonable efforts implies a *discretionary duty* to review and approve or disapprove of the territory expansion. The discretion inherent in "reasonable efforts" necessarily means that Volvo *may exercise it to disapprove a transaction*

47

No.  01-22-0002-4846

> if PacWest's plans for the new territory materially fail to meet reasonable, articulated, and non-discriminatory standards for territory expansion.

(Order No. 3 at 7 (emphasis added).)  The majority thus conceded that "Volvo's interest in effective distribution of its products" is a relevant factor in construing "reasonable efforts" by which the Side Letter "define[d] PacWest's expansion rights." Here, however, the majority simply disregards "Volvo's interest in effective distribution of its products," as reflected in the uncontradicted evidence that Volvo "has always judged territory expansions based on the sole metric of market share" and Volvo's position that "it did not make business sense to permit an under-performing dealer" to have exclusive rights to sell Volvo's products in even more territory.  That rationale, consistently applied to all Volvo dealers seeking to expand their territories, is on its face "reasonable, articulated, and non-discriminatory."  The majority makes no attempt to assess the reasonableness of Volvo's exercise of its discretion in a business context.  Instead, its principal rationale is impermissibly based on its misreading of the contracts.

The majority opinion acknowledges that the only reference in the Side Letter to KPMs is as a precondition to any obligation of Volvo even to "make reasonable efforts."  But that opinion errs in asserting that "the condition precedent is for the benefit of Volvo."  As the majority observed, "if PacWest fails to meet that condition, Volvo is relieved of any obligations stated in the Side Letter with regard to expansion."  It was PacWest that initiated the KPMs and inserted the reference in the precondition in the first place.  To obtain the benefit of limiting Volvo's discretion, PacWest undertook the burden of proving its satisfaction of the majority of the KPMs it had proposed.   As the price of obtaining the benefit of potential expansion, that limitation was plainly for the benefit of PacWest.

Notably, the majority of the KPMs other than market share were of such narrow operational significance that, insofar as the record shows, neither party bothered to keep records of their

48

No. 01-22-0002-4846

performance.[7] PacWest was plainly in a position to record and present evidence of its own actions and results yet presented little from its own files other than its financial statements to show its profitability. To impose the "reasonable efforts" obligation on Volvo, PacWest had the burden of proving that it had satisfied all of the elements of that precondition. Any deficiency in the definition of the KPMs was the fault of PacWest as their sole proponent and the burdened party and cannot constitute a waiver by or estoppel of Volvo.

Whether PacWest satisfied that burden is doubtful. As the majority concedes, it failed the market share element. Whether PacWest ordered and paid for enough Volvo machines to meet its market share goals is highly dubious, since PacWest never met those goals and presumably did not order and pay for machines it did not sell. To satisfy the Dealer Safety Performance metric, PacWest relied on and the majority accepted data that "tracks dealer effectiveness in completing safety-related product replacements and modifications within a specified time frame" as well as "mandatory product updates." The majority does not explain how either or both of these remotely related data sets sufficed to carry PacWest's burden on this metric. If not, then at best PacWest succeeded in arguably proving only three of the six KPMs – not the majority required to impose the "reasonable efforts" obligation of the Side Letter.

The majority further disregards its own finding in Order No. 3 that the "discretion inherent in 'reasonable efforts'" necessarily means that Volvo may exercise that discretion to disapprove a transaction if PacWest's plans for the new territory materially fail to meet "reasonable, articulated, and non-discriminatory standards for territory expansion." Whether Volvo acted based on the sole but commercially paramount criterion of market share or, as the majority now contends, based on

---

[7] The majority acknowledges that the evidence that PacWest presented of its compliance with a majority of the KPMs came largely from data that Volvo routinely circulated to all its dealers. However, the KPMs were unique to PacWest's dealer agreement. Data relevant to Volvo dealers generally had no necessary relationship to the particular terms of that unique contract.

No. 01-22-0002-4846

PacWest's refusal to sign the new dealer agreement accepted by the great majority of Volvo dealers, the record compels the conclusion that its disapproval applied "reasonable, articulated and non-discriminatory standards for territory expansion."   The majority declines to address the reasonableness of that decision in its full context.

Instead, the majority begs the question by changing the subject to conclude that Volvo was not entitled to rely on the terms of the contract by reason of what it deemed a "prior breach," namely Volvo's refusal to extend PacWest's exclusive territory based solely on its failure to achieve satisfactory market share:

> In following 'its standard practice of judging expansion by the single metric of performance as measured by market share … Volvo wholly disregarded that it had entered into an agreement with PacWest that relegated market share to just one of six metrics.  Because Volvo ignored the metrics and took the position that the Letter Agreement is unenforceable, and thereby breached the Letter Agreement at the outset, Volvo is not now in position to complain that PacWest failed to prove its satisfaction with the contract terms that Volvo ignored.'

The majority thus ignored its own conclusion as to Volvo's "discretion" in deciding on expansion much less the reasonableness of the decisions actually made.  More fundamentally, as noted above, the majority opinion contains no reference to any term in the Side Letter that "relegated market share to just one of six metrics" for purposes of "judging expansion," because there is none.  And PacWest had no right to expand "except as set forth in" the Side Letter.

Moreover, whether Volvo ignored the KPMs as the majority concludes is ultimately beside the point.  Absent proof of compliance with a majority of those terms, PacWest had no right to expansion.  Still more fundamentally, absent a contractual obligation to do otherwise, Volvo's decision to follow its universal practice of denying expansion to any dealer that had not met the 10% market share average of its dealer body could not be a breach of contract, whether or not PacWest could prove its satisfaction of its precondition.

50

No. 01-22-0002-4846

The "relegation" to which the majority refers occurred in the 2015 Dealer Agreement, not the Side Letter, as the majority explains in laying out the history of negotiation of that contract. Before PacWest closed on acquiring its dealership, "Volvo's standard form dealer agreement provided in section 6.2 that the "quantity of Volvo Machines ordered and paid for by the Dealer" and the "market share of the Volvo Products within the Territory will be the principal factors in evaluating the Dealer's performance." (*See* Ex. 13.)  The final contract provided that "[a]dditional key performance metrics will also initially include … the Dealer's customer service levels, profitability, safety performance, staff training and readiness, and potentially other measurements as may be agreed from time to time."  (Ex. 28, § 6.2.)

The majority thus relies upon a phrase ("principal factors") that was *omitted* from the final, signed Dealer Agreement to conclude that, to satisfy the reasonableness standard, Volvo was obligated to subordinate its universally applied, logically overriding concern with the dealer's success in selling Volvo machines and products to component metrics that individually may have had marginal effect on a dealer's performance but were of such lesser importance that they were not even measured by either party in the ordinary course of their seven-year relationship.  That ruling effects what section 3.5 expressly prohibits, reading the Dealer Agreement (specifically, a term omitted from the Dealer Agreement) to afford PacWest a right to acquire additional dealerships and territory beyond that set forth in the Side Letter.

Early drafts of the Side Letter had included the obligation to "make reasonable efforts" with no mention of KPMs.  (*See* Exs. 19, 21, 23.)   When the KPM precondition was eventually added to the draft Side Letter, the "reasonable efforts" clause remained unchanged, with no incorporation of or reference to any of the KPMs to restrict Volvo's discretion to decide whether

51

No. 01-22-0002-4846

to allow expansion or not. (Exs. 25, 26.) The majority opinion makes no mention of the negotiation history of the Side Letter. Thus the majority exposes its own error when it asserts that

> We cannot agree that Volvo should be found to have made reasonable efforts to offer PacWest a first opportunity to acquire additional territory when it disapproves a proposed transaction for a reason or reasons that are inconsistent with *other provisions of the very contract* that gives rise to the duty to act reasonably.

(Emphasis added.) It was the Side Letter that gave rise to the conditional obligation to "act reasonably" but the Side Letter contains no terms limiting Volvo's discretion on a dealer's request for expansion contradicting Volvo's decision. The majority is again more than a little disingenuous when it asserts that

> Volvo ignores that it *negotiated a bespoke dealer agreement* with PacWest that specifically demoted market share from the primary metric to just one of five other metrics, four of which were new additions to the standard Volvo dealer agreement.

(Emphasis added.) The dispositive fact is that no such relegation appears in the Side Letter, which alone governs PacWest's rights, if any, to expand. The parties "relegated" the market share metric in the Dealer Agreement at the same time that they negotiated the "reasonable efforts" language of the Side Letter, *without incorporating the relegation* – or indeed any reference to the KPMs at all – in the reasonableness standard as set forth in the Side Letter. The majority's own recitation of the negotiation history – what it includes and what it omits – thus strongly implies that there was no agreement incorporating the "relegation" into the reasonableness standard of the Side Letter, which alone governs expansion. The interpretation for which the majority argues depends upon the Dealer Agreement, which, by its terms, does not afford PacWest "any right to acquire additional dealerships, or any other Territory …" Section 3.5 of the Dealer Agreement means that conflating the two documents so as to expand PacWest's right to acquire new dealerships or territories violates the controlling terms of the agreements.

52

No. 01-22-0002-4846

The majority's observation that "[h]ad Volvo intended to preserve its standard practice of judging territory expansions by market share, then it should have ensured that the Side Letter actually said what it intended" has the logic exactly backward. It was PacWest that entered the transaction while purportedly planning future expansion. The majority's recitation of the negotiating history of the agreements emphasizes that Volvo's negotiators readily agreed to whatever changes PacWest proposed. Had PacWest wished to limit Volvo's discretion in deciding on territorial expansion of the type that PacWest says it always contemplated, it was up to PacWest "to ensure that the Side Letter actually said what [PacWest] intended." There is no evidence in the record that PacWest requested such language or that Volvo would have agreed to a term contrary to its universal practice if it had.

It is one thing to agree that PacWest could not be terminated under sections 6.2 and 22.2 of the Dealer Agreement without considering such metrics as the Dealer's customer service levels, profitability, safety performance, staff training and readiness, and quite another to conclude that even if PacWest failed to compete effectively for market share Volvo would be obligated to agree to expand the dealer's exclusive territory upon proof of satisfaction of a majority of those terms.

Finally, the majority's incorporation of the alternative KPMs into its analysis of the reasonableness of Volvo's exercise of its discretion to determine whether or not to approve PacWest's request for additional exclusive territories fails the commercial reasonableness test. The market share achieved by the members of its national dealer body was critical to Volvo's own business and financial performance. Each Volvo dealer had the exclusive right to sell Volvo's expensive capital products in its assigned territory, and Volvo's results depended on its dealers' success in selling Volvo products. Any dealer's deficient performance directly affected Volvo's bottom line. In contrast, the effect of the "additional" "initially" applicable KPMs on Volvo's

53

No. 01-22-0002-4846

success was at best indirect, largely to the extent that they contributed or not to the dealer's ability to sell and capture market share. By subordinating the paramount consideration of market share to the remaining KPMs the majority reaches a conclusion that is commercially unreasonable.

The majority tersely rejected the commercial reasonableness of Volvo's contention that it did not make business sense to permit an under-performing dealer to have the exclusive right to sell Volvo's products in even more territory based on its erroneous conclusion, addressed above, that Volvo ignored that it had "negotiated a bespoke dealer agreement with PacWest that specifically demoted market share from the primary metric to just one of five other metrics …" (Opinion, text at note 5.)

The majority's alternative rationales are no more persuasive. If the reasonableness of Volvo's decision does not turn on the additional KPMs, the fact that Volvo ignored those metrics is irrelevant and certainly not a breach. Similarly, if the Side Letter did not constrain Volvo's right to decide to whom it would grant exclusive territorial rights, the fact, as found by the majority, that Volvo ignored the KPMs cannot be a breach and for that reason is also irrelevant. Nor does Volvo's disregard of the additional KPMs constitute a waiver if those terms were irrelevant to its decision.

The majority changes horses in concluding that Volvo rejected PacWest's request not because of PacWest's failure to achieve minimal market share but because PacWest refused to accept the new dealer agreement that had been accepted by a large majority of Volvo's dealers nationwide. That conclusion contradicts considerable testimony from witnesses employed by both parties as well as PacWest's written position in this arbitration.[8] (PacWest Post-Hearing Brief at 2.) But the contradiction does not support the majority's conclusion.

---

[8] Evidence of additional considerations in Volvo's decision are aptly summarized in footnotes 3 and 4 of the majority opinion.

No.  01-22-0002-4846

First, PacWest was entitled to a new, similar agreement under the Side Letter only in the event that it obtained additional dealerships or territories.  If, as I submit I have demonstrated above, Volvo acted reasonably within its discretion in rejecting PacWest's request for expansion, PacWest had no right to a new territory and therefore no claim to a new dealer agreement.  Second, the record establishes that Volvo in fact engaged in lengthy negotiations with PacWest to attempt to reconcile the new agreement accepted by most of Volvo's dealers with the requirement of a "similar" agreement under the Side Letter.  Given that Volvo was not obligated to approve PacWest's expansion and Volvo's extended exchange of proposals and counterproposals on a form of agreement as a form of potential settlement or resolution, the fact that those negotiations did not result in final agreement does not constitute proof that Volvo acted unreasonably nor that it did so solely because PacWest refused to agree to the terms of an agreement.  Volvo had no obligation to do otherwise.

The record is clear that PacWest never approached the market share averaged by the members of Volvo's national dealer body and did refuse to accept the dealer agreement signed by some 80% of Volvo's dealers nationwide.  However, the standard of reasonableness under all of the circumstances does not depend on an either/or but a both/and analysis to account for all relevant circumstances.  The facts that PacWest <u>both</u> failed to achieve the market share that Volvo universally required for dealers wishing to expand <u>and</u> refused to sign the new dealer agreement accepted by 80% of Volvo's dealers together make Volvo's refusal to approve the expansion all the more reasonable.  The majority does not address that reasoning.

For all of the foregoing reasons, I conclude that incorporating the additional KPM checklist into the concept of "reasonable efforts" is contrary to and not supported by the language of the Side Letter, which alone governs PacWest's rights, if any, to expand its exclusive territory.  In my

55

No.  01-22-0002-4846

opinion, the majority's contrary conclusion therefore exceeds the authority of this tribunal.  As the majority rightly observes, whatever one thinks of the terms of the Side Letter, "we … cannot depart from it."  In the absence of any contractual term restricting Volvo's right to decide whether to grant exclusive rights to additional territories to a dealer that had never attained, much less maintained, and rarely even approached the market share averaged by the rest of Volvo's dealer body, I would find Volvo's decision to decline PacWest's expansion to be a legitimate, reasonable, non-discriminatory exercise of its discretion under the terms of the Side Letter, consistent with what the record shows to be its universal practice in responding to such applications and not, as the majority concludes, a breach of its contract, prior or otherwise.

Whether under the circumstances Volvo's contention that "the Side Letter was unenforceable as a matter of law" constitutes an actionable breach is assumed but not explained by the majority.  While the Panel has previously held unanimously that the Side Letter is in fact enforceable, a decision in which I joined, the majority's extension of that holding to a finding that Volvo's assertion of its contrary position constitutes a breach in and of itself in my view requires further explanation and justification.  Even if Volvo's litigation strategy were to constitute a breach, however, it would not support the multi-million dollar damages the majority awards, nor has there been any evidence of whatever damages, if any, it might entail.

For all of these reasons, I respectfully dissent from the findings of the majority that Volvo breached its contract with PacWest and that it must pay substantial damages allegedly resulting from such unsubstantiated breach.

56