## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VOLVO CONSTRUCTION EQUIPMENT, LLC, | : | Civil No. 1:24-CV-01847 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PACWEST MACHINERY, LLC, | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Plaintiff, Volvo Construction Equipment, LLC ("Volvo"), and Defendant, PacWest Machinery, LLC ("PacWest"), have been engaged in a years-long contract dispute.  That dispute now comes before this court following an extensive arbitration proceeding in which PacWest was awarded over $15,000,000.  Volvo asks this court to vacate the arbitration award pursuant to 9 U.S.C. § 10(a)(4).  Volvo makes myriad arguments as to why the award is fatally flawed.  However, it is clear that Volvo's arguments reflect nothing more than disagreement with the arbitrators' rulings.  Much more is required to vacate an arbitration award.  Accordingly, the court will confirm the award.

### BACKGROUND

The court gleans the facts of this matter from the arbitrators' findings of fact and draws all reasonable inferences therefrom.  *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987) ("[A]n arbitrator must find facts and a

court may not reject those findings simply because it disagrees with them."); *Citgo Asphalt Ref. Co. v. Paper, Allied-Indus., Chem., & Energy Workers Int'l Union Loc. No. 2-991*, 385 F.3d 809, 816 (3d Cir. 2004) (explaining that "a reviewing court must defer to the arbitrator's factual findings.")[1]

Volvo manufactures heavy construction equipment.  It sells this equipment through a network of dealers, who each have rights to specific territories.  (*See* Doc. 19, p. 8; Doc. 25, pp. 10–11.)[2]  In 2015, Joshua Green Corporation ("JGC") acquired Volvo's authorized dealer responsible for the Pacific Northwest though a newly created subsidiary called PacWest.[3]  (Doc. 25, p. 10.)  Subsequently, on December 17, 2015, Volvo entered into three identical agreements that appointed PacWest the exclusive authorized dealer in Washington, Idaho, and Oregon, respectively (collectively, "Dealer Agreement").  (Doc. 25, p. 3 n.3; *see* Doc. 19-5.)  The Dealer Agreement was negotiated during the same time period as a letter agreement between the two parties ("Side Letter"), which was executed 9 days before the Dealer Agreement, on December 8, 2015.  (Doc. 19-51.)

---

[1] The court infers these findings primarily from the two salient orders issued by the arbitrators. (Docs. 19-3 & 19-20.)  The court also looks to the undisputed facts in the parties' submissions for additional background.  (Docs. 19 & 25.)

[2] For ease of reference, the court uses the page numbers from the CM/ECF header.

[3] PacWest was originally known as JGC DealerCo LLC.  (*See* Doc. 19-5, p. 2.)

The Side Letter's purpose was "to grant PacWest an opportunity to expand its territory" in the future.  (Doc. 19-20, p. 7.)  To this end, paragraph 3 of the Side Letter stated that if a dealer outside PacWest's territories became for sale, then Volvo would "make an introduction for the parties and make reasonable efforts to offer [PacWest] a first opportunity to acquire the additional territory," so long as two conditions precedent were satisfied.  (Doc. 19-51, p. 1.)  First, PacWest could not account for more than 15% of Volvo's "new machine and part sales in North America over a rolling three-year period."  (*Id.*)  Second, PacWest had to be "meeting a majority of the mutually agreed key performance metrics in its current Territory."  (*Id.*)  Paragraph 3 further specified that "[a]ny new Territory assigned will require a new Dealer Agreement for that Territory, which terms shall be similar to [PacWest's] current Dealer Agreement(s)."  (*Id.*)

PacWest initially considered expansion in January 2020 when it sent a letter of potential acquisition terms to Tri-State Truck and Equipment ("Tri-State"), Volvo's dealer for Montana and Wyoming.  (Doc. 19-3, p. 26; Doc. 25, p. 15.)  Those negotiations lapsed for some time due to the COVID-19 pandemic, but recontinued in 2021.  (Doc. 19-3, p. 26.)  By November 2021, PacWest and Tri-State had drafted a contribution and purchase agreement, and by December 2021, PacWest proposed the acquisition to Volvo.  (*Id.*; Doc. 19-20, p. 9.)  A Volvo executive initially stated he would do his best to obtain approval for the

transaction, so long as both PacWest's market share in its current territory continued to improve and PacWest signed Volvo's new form dealer agreement. (Doc. 19-20, p. 9.)  Volvo had required all dealers seeking territorial expansion to sign this new dealer agreement since it was developed in 2017.  (Doc. 19-20, p. 9.)

PacWest did not accept the new dealer agreement as written.  Instead, the parties negotiated its terms between January and March 2022.  (*See id.*)  On March 22, 2022, Volvo sent what turned out to be its last proposal.  (*Id.*)  This proposal had materially less favorable terms than the Dealer Agreement.  (*Id.* at 12–13.) PacWest presumably rejected the proposal, because two days later, Volvo told PacWest that the Side Letter was invalid and superseded by the later-executed Dealer Agreement.  (*Id.* at 9.)

Seemingly undeterred, PacWest was also trying to acquire another dealer around this same time.  In April 2022, JGC executed a non-binding letter of intent with potential acquiree Construction Machinery Industrial ("CMI"), Volvo's dealer in Alaska.  (Doc. 19-3, p. 28.)[4]  CMI's controlling owner initially wanted JGC to own CMI and operate it independently from PacWest, but he later agreed to structure the acquisition so that PacWest owned CMI.  (*Id.*)  While the letter of intent contemplated a two-step acquisition, a later proposal of the deal involved a

---

[4] The arbitration panel's partial final award states that this letter of intent was signed on April 28, 2002.  (Doc. 19-3, p. 28.)  This date is plainly a typographical error.

one-time transaction through which PacWest would acquire 100% of CMI. (*Id.* at 29.)

Despite initial openness to PacWest's expansion, Volvo ultimately decided to nix the deals. In May 2022, Volvo filed a short-lived lawsuit in this court, seeking a declaratory judgment that the Side Letter was invalid. *Volvo Constr. Equip. N. Am., LLC v. Pacwest Mach., LLC*, No. 1:22-CV-00748 (M.D. Pa. filed May 20, 2022). Volvo voluntarily dismissed the case only a couple of weeks after filing it. Nevertheless, on August 29, 2022, Volvo sent letters to PacWest, Tri-State, and CMI notifying each of them that Volvo was not approving either acquisition. (Doc. 19-20, p. 10.) In its letter to PacWest, Volvo claimed that its decision was justified by PacWest's inability to maintain acceptable market share in its territory and PacWest's uncooperativeness with Volvo. (*Id.*)

Prolonged arbitration ensued before a panel of three arbitrators ("Panel"). A majority of the Panel found that Volvo breached its obligations under the Side Letter and consequently caused PacWest approximately $14.4 million in damages. (Doc. 19-3, pp. 43–44.) The Panel's reasoning for this ruling is contained in two orders, "Order No. 3," dated April 7, 2023 (Doc. 19-20), and the "Partial Final Award," dated September 25, 2024 (Doc. 19-3). After considering whether PacWest was entitled to recover other costs, the Panel issued its final award on January 30, 2025, which awarded PacWest a total award of $15,155,644.81. (Doc.

26-1, p. 14.)[5]  The final award adopted the holdings of Order No. 3 and the Partial Final Award.  (*Id.* at 13.)

Displeased with the Panel's decisions, Volvo initiated the instant proceeding on October 25, 2024, via a "petition for vacatur of arbitration award," which essentially takes the form of a complaint.  (Doc. 1.)[6]  The court's present task is to resolve three motions: (1) Volvo's amended motion to vacate the arbitration award pursuant to 9 U.S.C. § 10(a)(4), Doc. 19; (2) PacWest's cross-motion to confirm the arbitration award, Doc. 24; and (3) PacWest's motion for judgment on the final arbitration award, Doc. 30.[7]  All motions are fully briefed and ripe for adjudication.

---

[5]  Volvo initiated this proceeding before the issuance of the final award because of ambiguity as to whether the Partial Final Award triggered the three-month period within which Volvo would have had to serve its motion to vacate.  (Doc. 1, ¶ 2; Doc. 1-1, p. 3; s*ee generally* 9 U.S.C. § 12 (stating a motion to vacate must be served "within three months after the award is filed or delivered).)  Since the Panel has issued a final award, the court's consideration of the parties' motions at this time does not run afoul of the "'complete arbitration rule,' which mandates that courts should not entertain a lawsuit challenging a[n] . . . arbitration award until it is final." *Verizon Pa. LLC v. Commc'ns Workers of Am.*, 216 F. Supp. 3d 530, 531 (E.D. Pa. 2016).

[6]  The filing of this petition was procedurally improper.  Proceedings under 9 U.S.C. § 10 are "summary proceedings, which are shorn of certain formalities" otherwise present in civil litigation, "such as pleadings."  *PG Publ'g, Inc. v. Newspaper Guild of Pittsburgh*, 19 F.4th 308, 313 (3d Cir. 2021).  Accordingly, the Third Circuit has instructed that applications to vacate made pursuant to 9 U.S.C. § 10 "are . . . to be made as motions."  *Id.* at 312.  Accordingly, the court need not consider Volvo's "petition" in resolving this matter.

[7]  Volvo filed its initial motion to vacate and brief in support on October 25, 2024.  (Doc. 5.)  Thereafter, the court permitted Volvo to file an amended motion to vacate and brief in support.  (Doc. 9.)  Volvo filed its amended motion and brief in support on December 2, 2024.  (Doc. 19.)  This amendment rendered the original motion inoperative, and the court considers it withdrawn.  *See Rivera v. Dempsey*, No. 22-CV-00233, 2024 WL 247070, at *2 (M.D. Pa. Jan. 23, 2024) ("Because Plaintiff filed an amended motion, the Court treats his amended motion as the operative motion and deems his original motion withdrawn.").

## JURISDICTION

This court has subject matter jurisdiction over Volvo's motion to vacate pursuant to 9 U.S.C. § 10.

## STANDARD OF REVIEW

The Federal Arbitration Act permits a party to an arbitration to seek vacatur of an arbitration award in federal court.  9 U.S.C. § 10.  Vacatur of such an award, however, is appropriate "only in very unusual circumstances."  *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568 (2012) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)); *accord Newark Morning Ledger Co. v. Newark Typographical Union Loc. 103*, 797 F.2d 162, 165 (3d Cir. 1986) ("[A] reviewing court will decline to sustain an award 'only in the rarest case.'").  The exclusive grounds for vacating an award are enumerated in 9 U.S.C. § 10.  *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008).  These grounds are:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

A party seeking vacatur under § 10(a)(4) "bears a heavy burden." *Oxford Health Plans*, 569 U.S. at 569.  It must be shown that the arbitrators "stray[ed] from interpretation and application of the agreement and effectively 'dispense[d] [their] own brand of industrial justice.'"  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)).  Accordingly, this court will vacate an arbitration award only when "there is no support in the record for its determination or if it reflects manifest disregard of the agreement, totally unsupported by principles of contract construction." *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241 (3d Cir. 2005) (quoting *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir. 1993)).

It is not enough to show that the arbitrators made legal or factual errors— even if they were serious errors. *Oxford Health Plans*, 569 U.S. at 569.  This court's role is not "to hear claims of factual or legal error by an arbitrator [like] an appellate court" and decide whether the arbitrators correctly interpreted or applied the parties' contract.  *Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*, 357 F.3d 272, 280 (3d Cir. 2004) (quoting *Tanoma Mining Co. v. Loc. Union No. 1269, United Mine Workers of Am.*, 896 F.2d 745, 747 (3d Cir. 1990)).  The court solely must determine whether the arbitrators were "even

8

arguably construing or applying the contract." *Oxford Health Plans*, 569 U.S. at 569 (quoting *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000)).  So long as they were, their decision must stand "regardless of [the] court's view of its (de)merits." *Id.*

This standard for confirming an arbitration award is "singularly undemanding." *Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Acct.*, 618 F.3d 277, 296 (3d Cir. 2010) (quoting *United Transp. Union Loc. 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379 (3d Cir. 1995)); *accord Citgo Asphalt Ref.*, 385 F.3d at 816 (instructing that arbitration awards are "subject to a standard of only minimal rationality.")  It is so for an important reason.  A "limited judicial review" of arbitration awards "'maintain[s] arbitration's essential virtue of resolving disputes straightaway' and prevents arbitrations from becoming 'merely a prelude to a more cumbersome and time-consuming judicial review process.'" *Oxford Health Plans*, 569 U.S. at 568–69 (quoting *Hall St.*, 552 U.S. at 588.) Parties to an arbitration assume the risk that an arbitrator may err as "the price of agreeing to arbitration." *Id.* at 572–73.[8]

---

[8] Many of Volvo's arguments contend that vacatur is warranted because the Panel displayed "manifest disregard" for the law.  Volvo simply assumes the validity of the "manifest disregard" standard.  In reality, it is unsettled whether this standard for vacatur survived the Supreme Court's decision in *Hall Street*, which held that 9 U.S.C. § 10 contains the exclusive grounds for vacating an arbitration award.  552 U.S. at 584.  The Third Circuit has frequently declined to weigh in on the circuit split that has developed on this issue. *Facta Health Inc. v. Pharmadent LLC*, No. 23-2224, 2024 WL 4345299, at *6 n.5 (3d Cir. Sept. 30, 2024); *Sabre GLBL, Inc. v. Shan*, 779 F. App'x 843, 849 (3d Cir. 2019); *Whitehead v. Pullman Grp., LLC*, 811 F.3d 116,

## MOTION TO VACATE THE ARBITRATION AWARD

Volvo presents several arguments as to why the arbitration award should be vacated.  Generally, Volvo's arguments target the Panel's rulings concerning: (1) the validity and enforceability of the Side Letter; (2) the interpretation and application of the Side Letter; and (3) the damages caused by Volvo's breach of the Side Letter.  The court addresses each in turn.

### A. Validity and Enforceability of the Side Letter

Volvo's position throughout this dispute is that it had no duty to fulfill any obligations contained in the Side Letter, because the Side Letter was terminated by operation of the integration clause contained in the later-executed Dealer Agreement.  The Dealer Agreement's integration clause states in relevant part:

> This Agreement, including all of the Addenda and Volvo Policies and Procedures referred to herein (which are incorporated herein by reference), constitutes the entire Agreement between the Parties relating to the subject matter hereof.  This Agreement supersedes all existing agreements or arrangements (except for any written confidentiality, formulation, trademark license, or patent license agreements) by and between Volvo and [PacWest] relating to the subject matter hereof, whether written or oral, and all such prior

---

120–21 (3d Cir. 2016).  This court need not weigh in either, because this standard does nothing to help Volvo.  The "manifest disregard" standard is "extremely deferential" to arbitrators.  *Whitehead*, 811 F.3d at 121.  Like § 10(a)(4), it requires more than a purported legal error.  *Id.*  An award "must fly in the face of clearly established legal precedent."  *Id.* (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros,* 70 F.3d 418, 421 (6th Cir. 1995)).  For instance, arbitrators might show manifest disregard for the law if they "appreciate[] the existence of a clearly governing legal principle but decide[] to ignore or pay no attention to it."  *Id.* (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir. 1986)).  Even under this standard—assuming, without deciding, that it applies here—Volvo has failed to meet its burden for the reasons below.

agreements or arrangements are hereby deemed terminated by mutual consent of the Parties.

(Doc. 19-5, p. 13.)  Volvo believes this clause definitively rendered the earlier-executed Side Letter unenforceable.  (Doc. 19, p. 13.)

The Panel unanimously disagreed with Volvo.  The Panel recognized that under Pennsylvania law, "where several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other."  (Doc. 19-20, p. 2.)  In support of this proposition, the Panel cited *Wilson v. Viking Corp.*, 3 A.2d 180 (Pa. Super. Ct. 1938) and *Landreth v. First National Bank of Philadelphia*, 31 A.2d 161 (Pa. 1943).  (Doc. 19-20, p. 2.)

The Panel then applied this principle to the evidence before them, focusing on several key facts.  First, the parties negotiated the agreements at the same time—between August and December 2015—and executed them within nine days of each other.  (*Id.* at 2.)  This nine-day delay was necessary, Volvo admitted, because Volvo's dealer agreement with the selling dealership did not expire until eight days after the parties executed the Side Letter.  (*Id.* at 3.)  Second, the two agreements explicitly reference each other.  (*Id.* at 2–3.)  Section 3.5 of the Dealer Agreement states, "[e]xcept as set forth in the side letter dated December 8, 2015, [PacWest] does not obtain by virtue of this Agreement any right to acquire

11

additional dealerships." (Doc. 19-5, p. 3.) Paragraph 7 of the Side Letter states that its terms and conditions were "subject to and contingent upon . . . [PacWest] executing Volvo['s] . . . Dealer Agreement." (Doc. 19-51, p. 2.) Third, PacWest wanted to modify section 3.5 of the Dealer Agreement to provide for territorial expansion rights, but Volvo suggested that such terms should be moved to the Side Letter. (Doc. 19-20, p. 3.) This evidence led the Panel to conclude that the Side Letter was valid and enforceable because the parties had intended for the Side Letter and Dealer Agreement to be two instruments of the same contractual undertaking. (*Id.* at 3.)

Volvo now argues that this finding warrants vacatur of the arbitration award. Volvo claims that the Panel "rewrote" the integration clause by finding that it specifically incorporated the Side Letter. (Doc. 19, pp. 12–15.) The Panel came to this conclusion, according to Volvo, by not strictly construing the integration clause and by considering parol evidence, both in excess of their authority and in manifest disregard for Pennsylvania law. (*Id.*) Volvo's position is unpersuasive for several reasons. First and foremost, Volvo's premise is wrong. The Panel never held that the integration clause itself incorporated the Side Letter. The Panel simply observed that the "the Side Letter and Dealer Agreement refer to and incorporate each other and thus are two parts of a single contractual undertaking."

(Doc. 19-20, p. 3.)  The Panel did not read into the integration clause something that was not there.

Putting aside this faulty premise, the rest of Volvo's argument relies on an equally faulty assumption that an integration clause *per se* transforms a writing into a fully integrated agreement regardless of whatever contrary evidence exists. That proposition is impossible to square with Pennsylvania law.  It has long been settled in Pennsylvania that when "two agreements are made as part of one transaction they will be read together to express the essential elements of the parties' undertaking, notwithstanding the presence of an integration clause in the second agreement."  *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 639 (W.D. Pa. 2013); *accord Amin v. Lammers*, Civil No. 94-5980, 1995 WL 231048, at *4 (E.D. Pa. Apr. 18, 1995) ("But the presence of integration clauses in the separate agreements is not a bar to the agreements being construed together when the agreements are part of the same business transaction."); *Huegel v. Mifflin Const. Co.*, 796 A.2d 350, 356–57 (Pa. Super Ct. 2002) (reading two contracts together despite an integration clause in the later-executed contract);  *Neville v. Scott*, 127 A.2d 755, 757 (Pa. Super Ct. 1956) (explaining that an integration clause in a second agreement was "not controlling, since the second agreement did not fully express the essential elements of the parties' undertaking").  Thus, the Dealer Agreement's integration clause did not in and of itself preclude the Panel

from finding that the Side Letter and Dealer Agreement together constituted the parties' contractual undertaking.

The three cases upon which Volvo relies do nothing to undermine this well settled law. Those cases involved instances where evidence of an earlier agreement was barred because the court found a later agreement with an integration clause constituted the parties' entire contract. *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 437–38 (Pa. 2004); *M. O'Herron Co. v. Columbia Gas of Pa., Inc.*, No. 595 WDA 2021, 2021 WL 6069662, at *3–4 (Pa. Super. Ct. Dec. 23, 2021); *McGuire v. Schneider, Inc.*, 534 A.2d 115, 118 (Pa. Super. Ct. 1987). None of these cases state that an integration clause alone transforms an otherwise non-integrated writing into a fully integrated writing. These cases simply make clear that an integration clause is important in determining if a writing constitutes the parties' entire agreement. *Yocca,* 854 A.2d at 436; *M. O'Herron*, 2021 WL 6069662, at *3–4; *McGuire*, 534 A.2d at 117.

Volvo's argument concerning parol evidence further exposes the flaws of its position. Volvo insists that the Panel should have only looked to parol evidence in discerning what constituted the parties' entire agreement if the integration clause was ambiguous. (Doc. 19, p. 14.) Volvo is wrong as a matter of Pennsylvania law. Parol evidence is always admissible "to determine whether the parties intended [a] writing to be a complete embodiment of their agreement." *Murray v.*

*Univ. of Phila. Hosp.*, 490 A.2d 839, 844 (Pa. Super. Ct. 1985); *accord Yocca*, 854 A.2d at 436 ("[F]or the parol evidence rule to apply, there must be a writing that represents the 'entire contract between the parties.'"); *Int'l Milling Co. v. Hachmeister, Inc.*, 110 A.2d 186, 191 (Pa. 1955) ("[W]here it can be shown by competent evidence that no single writing embodied or was intended to embody the whole of the parties' understanding, the parol evidence rule has no application."); *McGuire*, 534 A.2d at 118 ("Whether a writing is an integrated agreement, and if so, whether the agreement is completely or partially integrated, are questions to be decided by the court prior to application of the parol evidence rule."). The Panel's consideration of parol evidence to determine what constituted the parties' entire agreement, was, therefore, completely appropriate, regardless of whether the integration clause existed or was ambiguous.

Ultimately, the Panel weighed the evidence in this case and found that the Dealer Agreement did not represent the entire agreement between Volvo and PacWest. As detailed above, this decision was supported by evidence and grounded in the language of the Side Letter and Dealer Agreement. The court sees no error at all in the Panel's decision, let alone error so severe as to warrant vacatur. Thus, Volvo has fallen well short of meeting its burden on this issue.

## B. Interpretation and Application of the Side Letter

Volvo next contends that the Panel's interpretation and application of the Side Letter warrants vacatur.  Volvo's arguments center mostly around two provisions of paragraph 3: the condition precedent that PacWest must be "meeting a majority of the mutually agreed key performance metrics in its current Territory" and the provision that states Volvo would "make reasonable efforts to offer [PacWest] a first opportunity to acquire the additional territory."  (Doc. 19-51, p. 1.)  Specifically, Volvo takes exception with the Panel's (1) interpretation of the phrase "key performance metrics"; (2) determination that PacWest met a majority of these metrics; and (3) holding that Volvo breached its obligations under paragraph 3.

### 1.  Interpretation of "Key Performance Metrics"

The Side Letter does not define "key performance metrics."  The Panel discerned the phrase's meaning by reference to section 6.2 of the Dealer Agreement.  (Doc. 19-20, p.5.)  Section 6.2 states:

> The quantity of Volvo Machines ordered and paid for by [PacWest] from time-to-time hereunder and the market share of the Volvo Products within the Territory will be key performance metrics in Volvo's evaluation of [PacWest's] performance.  Market share will be measured on a rolling twelve month basis.  Additional key performance metrics will also initially include [PacWest's] customer service levels, profitability, safety performance, staff training and readiness, and potentially other measurements as may be agreed from time to time.

(Doc. 19-5, p. 4.)  Although the Side Letter does not explicitly reference this provision, the Panel ruled that "key performance metrics" should be understood to mean the metrics enumerated in section 6.2.  (Doc. 19-20, p. 5.)  The Panel reasoned that such interpretation was appropriate given its ruling that the Side Letter and Dealer Agreement are "two parts of a single contractual arrangement." (*Id.*)

Volvo contends that the Panel improperly imported the terms of section 6.2 into the Side Letter.  (Doc. 19, pp. 15–16.)  This argument cannot carry the day for Volvo, as it reflects nothing more than a disagreement with the Panel's interpretation of the Side Letter.  Volvo cites no authority to support its position that the Panel committed a vacatur-worthy misjudgment.  Indeed, the decision was a product of construing the language of the Dealer Agreement and Side Letter, and naturally follows from the appropriate conclusion that those two documents should be read together.  Beyond that, the court will not scrutinize the Panel's interpretation given the standard the court applies in this context.

### 2. Determination that PacWest Satisfied a Majority of the "Key Performance Metrics"

The Panel convened "an evidentiary hearing on whether PacWest satisfied the key performance metrics, with PacWest bearing the burden of proof."  (Doc. 19-3, p. 4.)  Following the evidentiary hearing, the Panel held in PacWest's favor on this issue for two independent reasons.

First, the Panel held that Volvo's breach of the Side Letter estopped Volvo from arguing that PacWest did not satisfy a majority of the key performance metrics.  (*Id.* at 7–8 (citing *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 648 (Pa. 2009)).)  Specifically, the Panel determined that Volvo breached the Side Letter by only considering PacWest's market share and refusing to consider whether PacWest satisfied any other key performance metric in deciding to reject PacWest's desired expansions.  (*Id.* at 8.)

Second, the Panel determined that PacWest proved it had in fact satisfied a majority of the key performance metrics.[9]  In doing so, the Panel had to determine each metric's meaning and what was required for each to be met.  Neither the Side Letter nor the Dealer Agreement provide this information.  Section 6.2 of the Dealer Agreement simply states that the metrics are: (1) quantity of machines purchased; (2) market share; (3) customer service levels; (4) profitability; (5) safety performance; and (6) staff training and readiness.  (Doc. 19-5, p. 4.)

In determining what performance these metrics required, the Panel considered the facts surrounding how the metrics came to be included in the Dealer Agreement.  Volvo's standard dealer agreement in 2015 had only included quantity

_____

[9] One Panel member dissented, finding it was "doubtful" that PacWest carried its burden.  (Doc. 19-3, p. 52.)  That arbitrator stated, "at best PacWest succeeded in arguably proving only three of the six [key performance metrics]."  (*Id.*)

of machines purchased and market share.  (Doc. 19-3, p. 5).  Andrew Wold

("Wold"), PacWest's chief executive officer, requested that the other four metrics

be added to the Dealer Agreement.  (*Id.*)  Volvo did not object, and the parties had

no discussions about what the metrics meant, even after the execution of the Dealer

Agreement and Side Letter.  (*Id.* at 5–6.)  As the Panel put it, "[n]either party

sought to more specifically define the metrics or reach an understanding of how

they would be measured."  (*Id.* at 6.)

Despite this lack of subjective agreement, the Panel determined that the key

performance metrics—which the Panel observed are "terms customarily used in

industry generally and in distribution relationships in particular"—have meanings

that were ascertainable through the parties' course of performance.  (*Id.* at 8–10.)

The Panel found that "the metrics selected were, in general terms, well known to

Volvo, which regularly provided its dealers with a stream of data on numerous

aspects of dealer performance."  (*Id.* at 9.)  Volvo continued to develop this

information and regularly provided it to PacWest after execution of the Side Letter

and Dealer Agreement.  (*Id.*)  This information "clearly relate[d]" to the key

performance metrics, even though it did not use the metrics' precise terms.[10]  (*Id.*)

---

[10] The dissenting arbitrator did not find this information relevant in determining whether
PacWest satisfied the key performance metrics, which were bespoke to the Dealer Agreement.
(Doc. 19-3, p. 52 n.7.)  He opined that "[d]ata relevant to Volvo dealers generally had no
necessary relationship to the particular terms" of the Dealer Agreement.  (*Id.*)

The Panel then analyzed evidence pertaining to each metric. In doing so, the Panel mostly relied on the expert testimony of Neil Beaton ("Beaton"), PacWest's expert witness. (*Id.* at 12–18.) The Panel determined that PacWest satisfied all but one metric, *i.e.*, the "market share" metric. (*Id.* at 15, 18.)

PacWest satisfied the "quantity of machines purchased" metric, based on evidence that PacWest was "entitled to benefits associated with . . . the highest level[] of Volvo's machine ordering policy." (*Id.* at 13.) Testimony at the evidentiary hearing suggested that this ordering policy was concerned with the quantity of the machines ordered and not just the process of ordering, as Volvo argued. (*Id.*)

PacWest's financial performance in 2021 and 2022 satisfied the profitability metric. (*Id.* at 16.) Beaton opined in his report that PacWest was a profitable dealer based on its gross profit margin, pre-tax margin, and return on equity in 2021 and 2022.[11] (*Id.*) On cross-examination, Beaton testified as to PacWest's financial performance compared to other Volvo dealers. (*Id.*) In some areas, like gross profit and earnings before interest, taxes, depreciation, and amortization, PacWest met "Volvo's Excellence Target." (*Id.*) In others, like pre-tax profit, it

---

[11] The Panel discredited Beaton's opinion that PacWest was profitable based on the "credit limits and related pricing that Volvo Financial Services . . . provided to PacWest from 2015 to 2022." (*Id.* at 15–16.)

did not.  (*Id.*)  Beaton's opinion went unrebutted, as Volvo did not provide any

affirmative evidence that PacWest was not profitable.  (*Id.* at 16–17.)

PacWest satisfied the "customer service" metric based on its performance in

Volvo's "Customer Service Index," which is derived from surveys of the dealer's

customers conducted "by Volvo or its agents."  (*Id.* at 17.)  Volvo uses the Index as

"an element of an optional incentive program."  (*Id.*)  Each year between 2018 and

2022, PacWest achieved a score above Volvo's target score.  (*Id.*)

PacWest satisfied the "safety performance" metric, based on its scores in

Volvo's "Safety Campaigns."  (*Id.*)  These scores "track[] dealer effectiveness in

completing safety-related product replacements and modifications within a

specified time frame."  (*Id.*)  Volvo also uses these scores for incentive programs.

(*Id.*)  In 2021 and 2022, PacWest met Volvo's target of 100%.  (*Id.*)

Finally, PacWest satisfied the "staff training and readiness" metric, based

on its performance in "Competence Development" for Volvo's "Iron Mark"

incentive program.  (*Id.* at 18.)  The Panel explained that "Competence

Development" is satisfied if "the dealer had . . . all employees enrolled in at least

one competence development program."  (*Id.*)   In 2021 and 2022, PacWest's score

for Competence Development was 100%, presumably meaning that all of its

employees were enrolled in one qualifying program each year.  (*Id.*)

Volvo believes that the Panel committed several vacatur-worthy errors in reaching a decision on this issue. First, Volvo contends that the Panel should have made the legal conclusion that there was no "meeting of the minds," since it made the factual finding that the parties did not share a common understanding of what the key performance metrics meant or how they were to be applied. (Doc. 19, p. 17–18.) According to Volvo, the Panel ignored Pennsylvania law by not making such a legal conclusion. Next, Volvo argues that the Panel exceeded its authority by finding, without any evidence, that the key performance metrics were customary industry terms. (*Id.* at 16–17; Doc. 27, pp. 17–18.) Volvo then argues that the Panel's reliance on the parties' course of performance was done in manifest disregard for Pennsylvania law. (Doc. 19, p. 20.) Finally, Volvo argues that it was improper for the Panel to apply estoppel and waiver principles. (*Id.* at 20–22.) Volvo's argument fails at every step.

### i. Meeting of the Minds

Volvo insists that it is an "obvious truth" that the parties lacked a "meeting of the minds" with respect to the key performance metrics. (*Id.* at 16.) The truth of that proposition is obvious only to Volvo. Volvo seemingly thinks that a "meeting of the minds" occurs only when the parties share the same subjective understanding of all contractual provisions. Volvo is mistaken. Courts interpret contracts "based on the parties' outward and objective actions," not their subjective

intent. *Nicholas v. Hofmann*, 158 A.3d 675, 693 (Pa. Super. Ct. 2017). Therefore, contract formation does not require "a subjective, or 'true and actual,' meeting of the minds." *Id.* If it did, any interpretive ambiguity would render a contract unenforceable. That is not what Pennsylvania law provides. *See Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 586 (3d Cir. 2009) ("[A]ny ambiguity that flows from the language [the parties] used to craft the terms of their agreement is more properly seen as a dispute over the interpretation of the contract, not the definiteness (and thus enforceability) of the contract."); s*ee also Nicholas*, 158 A.3d at 693 (quoting *Simeone v. Simeone*, 581 A.2d 162, 165 (Pa. 1990)) ("Once a person enters into a written agreement[,] he builds around himself a stone wall, from which he cannot escape by merely asserting he had not understood what he was signing.")

Instead, the "meeting of the minds" requirement goes to the definiteness of the contract. A contract is definite when it is "certain about 'the nature and extent of its obligation[s].'" *Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 F. App'x 194, 202 (3d Cir. 2012) (quoting *Am. Eagle Outfitters*, 584 F.3d at 585). A contract would fail for indefiniteness "when it is 'impossible to understand' what the parties agreed to because the essential terms are ambiguous or poorly defined." *Id.* (quoting *Am. Eagle Outfitters*, 584 F.3d at 586). For example, "an agreement was [found to be] unenforceable when the parties failed to even discuss

terms like price and matter of performance." *Id.* (citing *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956)). "The definiteness requirement, however, does not mean that the presence of any interpretive ambiguity renders an agreement unenforceable," so long as the ambiguity "goes to details of the performance," rather than the "nature and extent of [the] obligation[s]." *Teva Pharm. Indus., Ltd. v. UnitedHealthcare Servs., Inc.*, Civil No. 16-4870, 2018 WL 1898911, at *11 (Apr. 20, 2018) (quoting *Shell's Disposal*, 504 F. App'x at 202).

Volvo's argument is clearly more concerned with ambiguity as to performance, rather than ambiguity as to the nature of its obligations. The fact that the parties did not share a subjective understanding of the definition of the key performance metrics and how they were to be measured only suggests uncertainty as to how Volvo would perform its obligations, not what its obligations were. Indeed, Volvo cannot now argue that its obligations were impossible to know when the Panel found that Volvo agreed to the inclusion of the additional key performance metrics and "specifically negotiated the wording" of those metrics. (Doc. 19-3, pp. 5–6.) Ultimately, Volvo's insistence that a meeting of the minds cannot occur in the face of this type of ambiguity is unpersuasive. Thus, the court sees no reason for vacatur on this argument.

24

### ii. Customary Industry Usage

Volvo's contention that the Panel determined, without evidence, that the key performance metrics were customary industry terms is similarly unpersuasive. As noted above, the Panel stated that the key performance metrics were "terms customarily used in industry generally and in distribution relationships in particular." (Doc. 19-3, pp. 8–9.) The Panel provided no further elaboration on this finding. Volvo seemingly thinks that the Panel made a finding that the metrics have a specific trade usage that differs from the plain meaning of the words. (*See* Doc. 27, p. 17.) As a general matter, considering evidence that a word or phrase has a particular trade usage is appropriate when interpreting contracts. *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001). But, that is not what the Panel did here. The Panel merely noted that terms like "customer service levels, profitability, [and] safety performance" are commonly used in industry and distribution relationships. (*See* Doc. 19-3, pp. 8–9.) Nothing suggests that the Panel interpreted the key performance metrics to have specialized meanings or to be terms of art. Rather, the Panel seems to have assigned to these terms their ordinary meaning, as is entirely appropriate. *See Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1259 (Pa. 2015) ("Unless otherwise specified, a contract's language shall be given its plain and ordinary meaning.")

This conclusion is strongly implied by the fact that the Panel analyzed data that was "clearly related" to the plain meaning of the key performance metrics.  In considering "profitability," for example, the Panel considered PacWest's gross profit margin; earnings before interest, taxes, depreciation, and amortization; pre-tax margin; and return on equity, thus strongly implying that it interpreted "profitability" to mean how well PacWest generated profits.  (*See* Doc. 19-3, p. 16.)  In considering "customer service levels," the Panel considered survey results of PacWest's customers, thus strongly implying that it interpreted that metric to mean how satisfied customers were with the service PacWest provided.  (*See id.* at 17.)  There is no indication that the Panel's interpretation of the key performance metrics arbitrarily departed from the plain meaning of the metrics' language.  Therefore, Volvo's argument to the contrary is not persuasive.

### iii. Course of Performance

Next, Volvo argues that the Panel improperly considered course-of-performance evidence in determining how the key performance metrics should be measured.  (Doc. 19, p. 20.)  Volvo argues that the Panel should have only considered the parties' course of performance if such evidence showed a common understanding of the key performance metrics.  (*Id.*)  Since the Panel determined that no common understanding ever materialized, Volvo believes the Panel should never have considered course of performance evidence.  (*Id.*)  In support of its

26

position, Volvo cites *Vanett v. Vanett*, No. 1792 EDA 2015, 2016 WL 5344129
(Pa. Super. Ct. July 21, 2016). The *Vanett* court affirmed a trial court's decision to
not consider extrinsic evidence that only reflected one party's "unique
understanding" of a contract. *Id.* at *4. It reasoned that course of performance is
appropriate to consider, "so long as the conduct/performance evidence manifests a
**common understanding** of the agreement at issue." *Id.* (emphasis in original).

Here, the Panel considered data "clearly related" to the key performance
metrics that Volvo routinely developed and shared with PacWest. This is not the
type of evidence that reflects one party's unique understanding of the key
performance metrics. In other words, it was fair to infer from this evidence what
Volvo and PacWest together intended the metrics to mean and how they should be
measured. Accordingly, the court does not see *Vanett* as an exception applicable
here to the general principle of Pennsylvania law that "course of performance may
always be considered as evidence of the intent of the parties." *Gen. Refractories
Co. v. First State Ins. Co.*, 94 F. Supp. 3d 649, 663 (E.D. Pa. 2015) (quoting *In re
Old Summit Mfg., LLC*, 523 F.3d 134, 137–38 (3d Cir. 2008)). Since the Panel
appropriately considered course-of-performance evidence in interpreting the
language of the key performance metrics, the court need not consider the issue
further.

27

### iv. Estoppel

The court need not dwell on Volvo's argument concerning the Panel's application of estoppel principles. The award is enforceable on the independent basis that the Panel appropriately determined that PacWest had satisfied in fact the key performance metrics. Accordingly, the propriety of the Panel's estoppel decision is irrelevant for present purposes. *See Bear, Stearns & Co. v. 1109580 Ont., Inc.*, 409 F.3d 87, 91 (2d Cir. 2005) (quoting *Willemijn Houdstermaatschappij, BV v. Standard Microsys. Corp.*, 103 F.3d 9, 13 (2d Cir.1997)) (explaining that a court must uphold an arbitration award "[i]f there is even a barely colorable justification for the outcome reached"); *Popkave v. John Hancock Distribs. LLC*, 768 F. Supp. 2d 785, 790 (E.D. Pa. 2011) (same).

### 3. Volvo's Breach of the Side Letter

Volvo's next argument concerns the Panel's determination that it breached the Side Letter. The Panel found that Volvo breached the Side Letter for at least two independent reasons. First, Volvo rejected PacWest's expansion bid "based on the single metric of market share," even though paragraph 3 of the Side Letter required Volvo to consider whether PacWest was meeting a majority of the key performance metrics. (Doc. 19-20, pp. 8–9, 13.) Second, Volvo rejected PacWest's expansion because PacWest refused to accept a new dealer agreement that was materially different than the Dealer Agreement, even though the Side

Letter guaranteed PacWest a dealer agreement similar to its current one. (*Id.* at 11–13.)

Volvo seriously challenges only the first of these findings. (Doc. 19, pp. 22–25.) Volvo argues that the Panel conflated the condition precedent that PacWest meet a majority of the key performance metrics with Volvo's obligation to make "reasonable efforts." (*Id.* at 22–23.) Volvo claims that making "reasonable efforts" did not require it to consider every key performance metric in exercising its discretion whether to approve PacWest's expansion. (*Id.* at 23.) The Panel exceeded its authority, Volvo's argument goes, by imposing upon Volvo the "extracontractual obligation" of considering every key performance metric. (*Id.*)

Volvo hardly contests the other finding, as it buries a half-hearted challenge to it in a footnote. (Doc. 19, p. 25. n.5.)[12] Volvo has plainly failed to satisfy its burden as to this second basis for the Panel's breach ruling. Accordingly, Volvo would not be entitled to relief even if its argument concerning the first basis were

---

[12] In that footnote, Volvo simply argues that it is irrelevant whether the proposed new dealer agreement was sufficiently similar to the Dealer Agreement, because Volvo's obligation to provide a similar dealer agreement "has nothing to do with" its obligation to make "reasonable efforts" and there is no evidence that PacWest's respective deals with Tri-State and CMI would close. (*See* Doc. 19, p. 25. n.5.) Such an argument does nothing to help Volvo. As noted below, there was evidence that the Tri-State and CMI deals would have both closed but for Volvo's breach. Moreover, the Panel explained how Volvo's proposed new dealer agreement was materially different than the Dealer Agreement, cited evidence that suggests PacWest's refusal to sign the new dealer agreement was a primary reason Volvo rejected PacWest's expansions, and interpreted the Side Letter to prohibit such a rationale for disapproving the expansions. (Doc. 19-20, pp. 10–13.) Volvo's disagreement with this ruling is no basis for vacatur.

meritorious.  *See Bear, Stearns & Co.*, 409 F.3d at 91; *Popkave*, 768 F. Supp. 2d at 790.  Therefore, the court need not consider the merits of that argument.

### C. Lost-Profit Damages involving Tri-State and CMI Deals

Volvo next argues that the court must vacate the arbitration award based on the Panel's calculation of damages.  The Panel found that PacWest was entitled to lost-profit damages, because it was more likely than not that PacWest would have closed the deals with Tri-State and CMI but for Volvo's breach.  (Doc. 19-3, pp. 22–31.)  The Panel then determined that PacWest's lost profits totaled $2,895,133 with respect to the Tri-State deal and $11,534,630 with respect to the CMI deal. (*Id.* at 38.)  Volvo argues that the Panel exceeded its authority in making these findings.  It contends that the Panel should not have found that it was more likely than not that either deal would have closed but for Volvo's breach.  (Doc. 19, pp. 26–31, 35–37.)  It also contends that the Panel's award of damages for both deals was unsupported by evidence.  (*Id.* at 31–34, 37–38.)  Neither of these are winning arguments.

### 1.  Likelihood of Tri-State Deal

In finding that the Tri-State deal would have closed but for Volvo's breach, the Panel relied on documentary evidence and the testimony of Thomas Zimmer ("Zimmer"), Tri-State's president.  (*See* Doc. 19-3, pp. 26–28.)  Zimmer testified that the PacWest deal was attractive to him, because "[i]t allowed him to exit the

business, take some money off the table, and invest in the new dealer." (*Id.* at 26.) Zimmer also testified that he was not talking to "other potential acquirers." (*Id.*) From this testimony, the Panel determined that Zimmer "wanted and intended to proceed with the deal." (*Id.* at 27.) Moreover, the Panel determined that no evidence showed "any significant impediment" to closing the deal. (*Id.*) At arbitration, Volvo argued that Pac-West and Tri-State would not have been able to obtain the third-party approvals from other companies that were necessary for the deal to close. (*Id.* at 27–28.) The Panel discredited Volvo's proffered testimony on this issue and "strongly doubt[ed] that the [third parties] would have presented any problem" to the Tri-State deal. (*Id.* at 28.) Instead, it credited Zimmer's testimony that he assumed the third parties would have consented "given consolidation in the industry, the necessity for scale, and the prospect of fresh money . . . coming in." (*Id.* at 27.) It also credited Zimmer's testimony that he had not experienced any issue with third-party approvals in connection with a previous transfer of interest in 2006. (*Id.*)

Volvo now contends that the Panel, in making this ruling, ignored Pennsylvania law and exceeded its authority by excusing PacWest from proving (1) that it had a binding contract with Tri-State and (2) that it could satisfy the condition precedent of obtaining the third-party approvals. (Doc. 19, pp. 26–31.) This argument simply goes to the weight of the evidence supporting the Panel's

decision.  Volvo does not contest the well-settled principle that lost profits are

recoverable under Pennsylvania law.  *See Delahanty v. First Pa. Bank, N.A.*, 464

A.2d 1243, 1258 (Pa. Super. Ct. 1983) (finding that lost profits are recoverable if

they can be established (1) with reasonable certainty; (2) to be the "proximate

consequence of the wrong"; and (3) as reasonably foreseeable).  Nor does Volvo

persuasively argue that lost profits are legally unrecoverable in this case.  No

authority that Volvo cites suggests that a binding contract with Tri-State was

necessary for PacWest to recover lost profits.  Volvo's proffered authority has

nothing to do with lost-profit damages and, instead, involves failed breach-of-

contract claims premised on non-binding agreements.  *White Winston Select Asset*

*Funds, LLC v. Good Times Rests., Inc.*, No. 23-1297, 2024 WL 2745174, at *1 (3d

Cir. Mar. 1, 2024) (finding that under Delaware law the parties' non-binding

agreement to negotiate did not create a binding agreement to close a deal); *Lazer &*

*Lazer Corp. v. Agronomed Pharm. LLC*, 618 F. Supp. 3d 186, 198–202 (E.D. Pa.

2022) (determining that a contract never existed between the parties); *Philmar*

*Mid-Atl., Inc. v. York St. Assocs. II*, 566 A.2d 1253, 1255 (Pa. Super. Ct. 1989)

(finding that a non-binding letter of intent could not give rise to a breach-of-

contract claim).  These cases are inapposite here.  With no legal authority

suggesting lost profits were irrecoverable in the absence of a binding contract,

Volvo's position reduces to a disagreement with the Panel as to what the evidence proves.

Similarly, Volvo proffers no authority that suggests recovery of lost profits was *per se* barred by PacWest and Tri-State not obtaining the approvals from third parties in the face of Volvo's disapproval.  Volvo's argument is simply that PacWest and Tri-State could never have shown that it would have received approval from the third parties because they did not in fact receive such approval. This again represents nothing more than a disagreement about whether the weight of the evidence favors PacWest.

As detailed above, the Panel weighed evidence and determined that PacWest had satisfied its burden to recover lost profits even in the absence of a binding contract with Tri-State and pre-obtained approval from third parties.  The court will not reweigh the evidence now.  *See Mut. Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.*, 868 F.2d 52, 56 (3d Cir. 1989) (explaining that it is not a court's role "to sit as the panel did and reexamine the evidence under the guise of determining whether the arbitrators exceeded their powers").

### 2.  Likelihood of CMI Deal

Like with the Tri-State deal, the Panel relied on documentary evidence and testimony from a key stakeholder in deciding that the CMI deal would have closed but for Volvo's breach.  (*See* Doc. 19-3, pp. 28–29.)  JGC and CMI signed a non-

binding letter of intent, which contemplated JGC acquiring CMI over two years.
(*Id.* at 28.)  Initially, Ken Gerondale ("Gerondale"), CMI's controlling owner, did
not want PacWest and CMI to be under the same management team.  (*Id.*)  Thus,
the deal was structured so that CMI would become a subsidiary of JGC that was
independent of PacWest.  (*Id.*)  Gerondale, however, relented and agreed to a new
deal structure.  (*Id.*)  That structure involved PacWest acquiring 100% ownership
of CMI in a single closing.  (*Id.* at 29.)  The Panel determined that the revised
terms of the transaction structure and communications between CMI and PacWest
made it "amply clear . . that it was JGC's intention to acquire CMI through its
affiliate, PacWest."  (*Id.* at 25.)  As to the likelihood of the CMI deal occurring,
Gerondale testified that "there's no doubt" the CMI deal would have closed.  (*Id.* at
29.)  He was so sure the deal was going to close that he announced it to his senior
management team.  (*Id.*)  Moreover, he testified that CMI would have obtained the
necessary third-party approvals given that none of the third parties voiced any
objections when he broached the deal with them.  (*Id.*)

Volvo cites no authority to suggest the Panel's decision warrants vacatur.
Instead, it again asks this court to reweigh the evidence to vacate the award.  Volvo
argues that it cannot be liable to PacWest for lost profits, because PacWest was not
going to obtain ownership of CMI.  (Doc. 19, pp. 35–36.)  According to Volvo,
only JGC was going to obtain an ownership interest in CMI, because JGC executed

the non-binding letter of intent with CMI. (*Id.*) Yet, the Panel credited evidence that JGC intended for PacWest to own CMI and that Gerondale agreed to such a deal. Since there is some evidence to support the Panel's decision, the court must reject Volvo's arguments.

Volvo further claims that PacWest cannot recover lost profits even if PacWest were the party that would have acquired CMI, because PacWest had no binding contract with CMI and those parties had not in fact obtained third-party approvals for the deal. This recycled argument fails for the same reason it failed with respect to the Tri-State deal.

### 3. Calculation of Lost Profits

Finally, Volvo contends that the Panel's calculation of the lost profits awarded to PacWest warrants vacatur. For both deals, the Panel relied upon Beaton's estimation of PacWest's lost profits. (*See* Doc. 19-3, pp. 33–35; Doc. 19-46.) Generally, Beaton estimated Tri-State's annual profits between 2022 and 2041 by utilizing PacWest's projections of Tri-State's potential net income between 2022 and 2027—which PacWest used to evaluate Tri-State's purchase price—and then extrapolating from the projected income in 2027. (Doc. 19-3, p. 34.) Beaton estimated CMI's annual profits for the same 20-year period by utilizing CMI's actual net income in 2022 and 2023, and then, beginning in 2024, extrapolating from CMI's 10-year average annual net income. (*Id.* at 33.) For

both deals, Beaton's extrapolations assumed a 3% annual growth rate, which the Panel determined was reasonable. (*Id.* at 33, 35.) From there, Beaton calculated a cumulative total of lost profits for each deal: $28,739,205 for the Tri-State deal and $73,414,753 for the CMI deal. (*Id.*) Beaton then adjusted these cumulative totals for present value while "applying a 15% discount," which brought the totals to $4,264,900 for the Tri-State deal and $18,918,100 for the CMI deal. (*Id.*) The Panel then determined that these totals had to be reduced to reflect PacWest's duty to mitigate its damages. (*Id.* at 37.) Relying on Volvo's expert's calculations, the Panel reduced the totals by the amount that PacWest could have obtained if it had invested the purchasing funds in "a conservative, low-risk, low rate of return investment." (*Id.*) These calculations used a "3.5%, 20-year Treasury bond investment rate." (*Id.*) The final result of the Panel's methodology resulted in total lost-profits damages equaling $2,895,133 for the Tri-State deal and $11,534,630 for the CMI deal. (*Id.* at 38.) Volvo does not challenge the Panel's methodology for arriving at these figures. Instead, Volvo challenges certain factual assumptions used in the methodology.

With respect to the Tri-State deal, Volvo argues that the Panel's calculations baselessly included an assumption that PacWest would have obtained another dealership in its hypothetical post-deal territory. (Doc. 19, pp. 31–34.) Volvo correctly points out that PacWest's projections of Tri-State's 2022–2027 income

assumed it would acquire another dealership and that Beaton used PacWest's projection without adjustment.  (Doc. 19-3, p. 34; Doc. 19-47, p. 10.) Nevertheless, the Panel determined that the projected income would not have materially changed if PacWest did not acquire this additional dealership.  (Doc. 19-3, p. 34.)  It reasoned that "there would be significant costs associated with the additional acquisitions . . . which would offset additional projected net income." (*Id.*)  Thus, this hypothetical acquisition was entirely immaterial to the Panel's calculation of lost profits for the Tri-State deal.  The Panel cited to testimony from Beaton in support of its ruling.  (Doc. 19-3, p. 34.)  When asked if his calculation would be incorrect if PacWest never acquired the additional dealership, Beaton testified, "[i]t would not be incorrect."  (Doc. 19-47, p. 10.)  Although this testimony does not discuss additional costs of acquiring a dealership, the court cannot say that there is "absolutely no support at all in the record justifying the" Panel's ruling.  *United Transp. Union Loc. 1589*, 51 F.3d at 379.  Therefore, that ruling must stand.

With respect to the CMI deal, Volvo argues that the Panel impermissibly awarded lost profits as if PacWest would have obtained 100% ownership of CMI, even though there was no binding agreement with such terms.  (Doc. 19, p. 37–38.) As noted above, there is evidence in the record to support the determination that PacWest would have acquired 100% of CMI.  (Doc. 19-3, p. 29.)  The existence of

such evidence defeats Volvo's argument.  *See United Transp. Union Loc. 1589*, 51 F.3d at 379.

### D. Volvo's Motion to Vacate will be Denied.

Volvo has failed to carry its burden of showing that the arbitration award should be vacated.  Accordingly, the court will deny its motion to vacate.

### MOTION TO CONFIRM THE AWARD AND MOTION FOR JUDGMENT

The court next turns to PacWest's motion to confirm the arbitration award and its motion for judgment on the award.  Having determined that Volvo is not entitled to vacatur, the court must rule that PacWest is entitled to confirmation of the award and judgment on it.  Indeed, "confirmation and vacatur of an arbitration award are simply opposite sides of the same FAA coin."  *PG Publ'g*, 19 F.4th at 313.  This court is bound by statute to confirm an arbitration award "unless the award is vacated, modified, or corrected as prescribed in [9 U.S.C. §§ 10 & 11]."  9 U.S.C. § 9; *accord Hall St.*, 552 U.S. at 582; *PG Publ'g*, 19 F.4th at 313.  Having not vacated the award here, the court will confirm it.[13]

---

[13] At the request of the parties, the court scheduled oral argument for this matter.  That argument will be canceled in light of the court's determination that such a proceeding is unnecessary to resolve the motions at hand.  *See PG Publ'g*, 19 F.4th at 314 ("A court can, within its discretion, decide an FAA motion without conducting a full hearing or taking additional evidence.")

## CONCLUSION

For the foregoing reasons, the court will deny Volvo's motion to vacate the arbitration award and will grant PacWest's cross-motion to confirm the award and its motion to enter judgment thereon.  An appropriate order will issue.

<u>s/Jennifer P. Wilson</u>
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: July 15, 2025